IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| COX COMMUNICATIONS INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> SPRINT COMMUNICATIONS COMPANY L.P., et al., <br><br> Defendants. | C.A. No. 12-487 SLR |

**PLAINTIFFS' CORRECTED OPENING BRIEF IN SUPPORT OF THEIR CONSTRUCTION OF "PROCESSING SYSTEM" AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

*Of Counsel*:

WINSTON & STRAWN LLP
Michael L. Brody
James Winn
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

David S. Bloch
101 California Street
San Francisco, California 94111
(415) 591-1452

Pejman F. Sharifi
Krishnan Padmanabhan
200 Park Avenue
New York, New York 10166
(212) 294-6700

Steffen N. Johnson
Eimeric Reig-Plessis
1700 K Street, N.W.
Washington, D.C. 20006
(202) 282-5000

John C. Phillips, Jr. (Bar No. 110)
David A. Bilson (Bar No. 4986)
PHILLIPS, GOLDMAN & SPENCE, P.A.
1200 North Broom Street
Wilmington, Delaware 19806
(302) 655-4200
jcp@pgslaw.com
dab@pgslaw.com

*Attorneys for Plaintiffs*

Dated:  April 9, 2015

** Cox submits this Corrected Brief to correct citations to conform to the exhibits referenced in the Joint Appendix (D.I. 220).  Although the content of the brief has not changed, the corrected citations have slightly changed the pagination/length of the brief.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 3

      A.     Sprint's "Control Patents"...........................................................................3

      B.     Sprint's "ATM Interworking Patents" ......................................................3

      C.     The alleged "problem" in the prior art ......................................................4

      D.     The "solution" claimed in Sprint's patents ................................................6

      E.     Judge Lungstrum's opinions ......................................................................9

ARGUMENT ...................................................................................................................... 10

    I.    Under longstanding Supreme Court and Federal Circuit precedent, structural claim limitations that are described only by their function are fatally indefinite. .......................................................................................11

    II.    Sprint's "plain and ordinary" construction cannot be correct, because the claimed "processing system" is described only by its function—it is indefinite on its face.....................................................................................13

    III.    Only Cox's alternative construction is consistent with the patent specifications, but even that correct construction cannot save Sprint's claims from indefiniteness. .....................................................................15

      A.     The only "processing system[s]" the patents describe are the CCP and CCM: external devices that can control routing from outside the network path..............................................................................15

      B.     Even under Cox's correct construction, "processing system" remains indefinite, because Sprint's patents disclose no structure for the CCP/CCM. ..............................................................................17

CONCLUSION.................................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps;">Cases</span>

*Aristocrat Techs. Austl. Pty. Ltd. v. Int'l Game Tech.*,
    521 F.3d 1328 (Fed. Cir. 2008)...............................................................................2, 19, 20

*Augme Techs., Inc. v. Yahoo! Inc.*,
    755 F.3d 1326 (Fed. Cir. 2014)..........................................................................................19

*Blackboard, Inc. v. Desire2Learn, Inc.*,
    574 F.3d 1371 (Fed. Cir. 2009)..........................................................................................20

*Fenner Invs., Ltd. v. Cellco P'ship*,
    2015 WL 570730 (Fed. Cir. Feb. 12, 2015)...............................................................13, 15

*Fla. Atl. Univ. Research Corp. v. Acer, Inc.*,
    2014 WL 2960968 (S.D. Fla. June 30, 2014) ....................................................................12

*Function Media, L.L.C. v. Google, Inc.*,
    708 F.3d 1310 (Fed. Cir. 2013)..................................................................................... 12-13

*Gen. Elec. Co. v. Wabash Appliance Corp.*,
    304 U.S. 364 (1938)...........................................................................................................11

*Halliburton Energy Servs., Inc. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008)...................................................................................11–13

*Hand Held Prods., Inc. v. Amazon.com*,
    2014 WL 5779416 (D. Del. Nov. 5, 2014) ..............................................................2, 12, 19

*Holland Furniture Co. v. Perkins Glue Co.*,
    277 U.S. 245 (1928)...........................................................................................................11

*In re Donaldson Co.*,
    16 F.3d 1189 (Fed. Cir. 1994)...........................................................................................13

*In re Katz Interactive Call Processing Patent Litig.*,
    639 F.3d 1303 (Fed. Cir. 2011).........................................................................................11

*In re: TR Labs Patent Litig.*,
    MDL No. 2396, Dkt. 295 (D.N.J. July 14, 2014) ..............................................................18

*Interval Licensing LLC v. AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014).........................................................................................18

*Mas-Hamilton Grp. v. LaGard, Inc.*,
    156 F.3d 1206 (Fed. Cir. 1998)..........................................................................14

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
    344 F.3d 1205 (Fed. Cir. 2003)......................................................................2, 13

*Microsoft Corp. v. Multi-Tech Sys.*,
    357 F.3d 1340 (Fed. Cir. 2004)..........................................................................17

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014).............................................................1, 10, 11–14, 18, 21

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)..........................................................................15

*Praxair, Inc. v. ATMI, Inc.*,
    543 F.3d 1306 (Fed. Cir. 2008)...................................................................... 16-17

*Renishaw PLC v. Marposs Societa' per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998)..........................................................................15

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
    653 F.3d 1296 (Fed. Cir. 2011)..........................................................................15

*Robert Bosch LLC v. Snap-On Inc.*,
    769 F.3d 1094 (Fed. Cir. 2014)...............................................................14, 17, 20

*Sprint Communications Co. L.P. v. Comcast Cable Communications LLC*,
    2014 WL 5089402 (D. Kan. Oct. 9, 2014) .................................................9–10, 20

*United Carbon Co. v. Binney & Smith Co.*,
    317 U.S. 228 (1942)...................................................................................11–12

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007)..........................................................................15

STATUTES

35 U.S.C. § 112............................................................................... 2, 10-11, 21

35 U.S.C. § 112(b) ....................................................................... 1, 11-12, 14, 17, 21

35 U.S.C.§ 112(f)..................................................................................2, 12, 17–18, 20

## INTRODUCTION

Sprint alleges that Cox's Voice-over-Internet Protocol ("VoIP") phone networks infringe eleven patents that, says Sprint, cover basic aspects of VoIP telephony.  Yet for six of those patents, that is impossible to know, because a key phrase in each asserted claim—"processing system"—is so obscure as to render the claims indefinite under 35 U.S.C. § 112(b).  Cox thus sought and received leave to file this early claim construction and partial summary judgment brief (D.I. 185), before the Court or the parties invest more resources on these patents.[1]

The patents' "processing system" limitation violates a core tenet of patent law:  As the Supreme Court reaffirmed last year in *Nautilus, Inc. v. Biosig Instruments, Inc.*, "a patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of *what is still open to them.*"  134 S. Ct. 2120, 2129 (2014) (citation omitted; emphasis added).  While a "modicum of uncertainty" is inevitable, the law does not permit "'[a] zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims.'"  *Id.* at 2128, 2129, 2123 (citation omitted).

Sprint has resisted construing the "processing system" limitation at all, insisting it has a "plain and ordinary meaning."  If Sprint is right, then "processing system" would include any "system" that "processes," leaving the phrase fatally indefinite for two reasons.  First, it has been the law for more than a century that a structure (here, a "system") cannot be claimed functional-

---

[1]  The patents at issue herein and the file wrappers will be included in a Joint Appendix, which will be submitted upon the completion of briefing.  The parties' proposals for construing the term "processing system" are set forth in Exhibit A, which is attached along with other Exhibits to the Declaration of David S. Bloch.  While this motion addresses only 6 of the 15 patents Sprint has asserted, the other patents have been extensively litigated.  In other cases, the patents not addressed here have been invalidated or acknowledged by Sprint not to cover literally VoIP networks like Cox's, or Sprint has asserted far less in damages than it has suggested may be at issue for the patents subject to this motion.  Thus, while this motion will not fully resolve this litigation, it will go a long way toward that end.

ly, by describing merely what it *does* (here, according to Sprint, "processing"). *Infra* 11-13. To satisfy the "definiteness" requirement of § 112, one also must know what the claimed "system" *is*. Otherwise, there is no limitation at all on the structures (as opposed to the functions) covered by the claim. Second, even if purely functional claiming were permissible, the function nominally claimed here—"processing"—is indefinite since it could refer to anything that processes.

Cox, unlike Sprint, has at least attempted to bound the "processing system" limitation, by linking it to the only thing designated by Sprint's patents as a "processing system": a black box variously referred to as a "communication control processor" ("CCP") or a "call connection manager" ("CCM"). But even this construction cannot save Sprint's patents. The disclosures of the CCP/CCM (the two "devices" do essentially the same thing) are purely functional—with no structure to support them. Thus, even if limited to the disclosed CCP and CCM, the "processing system" limitations are still indefinite and the Court should grant partial summary judgment.

Nor, for that reason, can the patents be saved under § 112(f). That section "allow[s] the patentee to express the claim in terms of function"—but *only if* "clearly link[ed]" to a "'corresponding structure'" in the specification. *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210-11 (Fed. Cir. 2003). Moreover, the courts have "consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor," which equates to "pure functional claiming." *Aristocrat Techs. Austl. Pty. Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Judge Andrews of this District recently applied the same logic to invalidate the term "'processing means'"—a term nearly identical to "processing system"—as indefinite. *Hand Held Prods., Inc. v. Amazon.com*, 2014 WL 5779416, *2 (D. Del. Nov. 5, 2014). Where, as here, a "particular function" involves "processing," it is "clear" that "special programming" is "requir[ed]," and "the patent must disclose

2

an algorithm for performing th[at] claimed function." *Id.* Sprint's patents disclose no such "algorithm" for the claimed "processing system." Thus, they are invalid, warranting partial summary judgment.

## STATEMENT OF FACTS

The patents here fall into two groups, each of which has a shared specification:

### A.     Sprint's "Control Patents"

U.S. Patent Nos. 6,452,932, 6,463,052, 6,633,561, and 7,286,561 (the "Control Patents") describe a hybrid telephone network that combines broadband Asynchronous Transfer Mode ("ATM") packet switches and narrowband Public Switched Telephone Network ("PSTN") circuit switches. Calls are connected between PSTN switches across the ATM network over an ATM "virtual circuit" selected by a CCP that sits outside of, and controls, the ATM network. The independent claims (reproduced in Ex. B) are claim 1 of the '932 patent, claim 1 of the '052 patent, claims 1 and 24 of the '3,561 patent, and claim 11 of the '6,561 patent. Each of the Control Patents names Joe Christie as the sole inventor.

Each claim calls for a "processing system" associated with a packet network to receive a signal from a traditional phone network. The "processing system" "processes" the signal to identify the destination or routing for the call. In most claims, the "processing system" generates an "identifier" or "network code" to designate the exit point from the packet network; and in all claims, the "processing system" generates and transfers a "message"—an "instruction" or "control message"—which causes the call to be routed through the packet network to its destination.

### B.     Sprint's "ATM Interworking Patents"

U.S. Patent Nos. 6,298,064 and 6,473,429 (the "ATM Interworking Patents") describe an attribute of a hybrid ATM-PSTN network similar to the network described above. They cover an ATM "cross-connect" that works with an ATM interworking unit—also called an ATM multi-

plexer—to convert voice data received from a traditional phone network (known as a time division multiplexed, or "TDM," network) into data packets called "ATM cells." The ATM cells are suitable for transfer over an ATM network. As with the Control Patents, the handoff between the traditional and ATM networks is managed by an external controller, the "call/connection manager" or "CCM." The CCM performs essentially the same functions as the CCP above. The independent claims (shown in Ex. B) are claim 1 of the '064 patent and claim 1 of the '429 patent.

Each claim calls for a "processing system" that performs functions similar to those performed by the Control Patents' "processing system": It receives "signaling" or "information" that it "processes" to select an "identifier" or "DS0 connection" to a traditional phone network. The "processing system" then generates and transmits a "message" containing the "identifier" or "DS0 connection" to an interworking unit for conversion and transmission across the ATM packet network. As with the Control Patents, Mr. Christie is the sole listed inventor.

### C.   The alleged "problem" in the prior art

All six patents address the same "problem": the "limitations" that purportedly arose when the devices making up the "path" over which telecommunications travel must also establish that path, an operation known as "call control."

As the Control Patents note, Mr. Christie's objective was to create a new "system … for providing communications control," which he defined as "the process of setting up a communications path"—*i.e.*, "the selection of network elements … which will form part of the communications path," and of "the connections between network elements." JA0525 (abst.); JA0535 (1:25-46). Then, the most "common method used in communication control [wa]s signaling among the switches" in traditional phone networks. JA0535 (1:56-59). And "while communications control" and the "communications path" were "distinct" concepts, Mr. Christie saw a shortcoming: "both [we]re dependent on the switch." *Id.* (2:54-56). The source of this "dependen[ce]

4

on the switches," he reasoned, was that the "[s]witches have always been required to [both] physically make connections and provide control over which connections are required." JA0544 (20:44-51).

"In prior systems," Mr. Christie explained, "the switches would [1] select the network elements and the connections," and "[2] actually provid[e] a part of the actual connection." JA0538 (8:19-23). As he saw it, the resulting problem was that "prior systems" were "restricted to the communication control capabilities provided by the switches" *Id.* (8:23-26). "Switch capabilities have not been able to keep up with all of the network possibilities available," and "[t]he result is a limited system." JA0544 (20:48-53). In Mr. Christie's view, the primary "impediments to developing improved networks" were due to "reliance on switches to *both* perform communication control *and* to form *part of the communication path*." JA0536 (3:20-23) (emphasis added). He thus perceived "a need for a portion of the communication control processing to be *independent of* the switches that form a part of the communications path." *Id.* (3:28-31) (emphasis added).

Mr. Christie also noted in the ATM Interworking Patents that, to "utilize bandwidth more efficiently" by using "switched virtual circuits" and "switched virtual paths" (JA0484 (1:33-39)), prior art systems required "ATM switches" to utilize "both signaling capability and call processing capability" (*id.* (1:40-45)). Yet doing so "cause[d] problems because [the switches] must be very sophisticated to support" this functionality. *Id.* (1:45-50). The "generation of sophisticated ATM switches" that can handle both call processing and signaling "is not yet mature and should be expensive when they are first deployed." *Id.* (1:54-56). Thus, Mr. Christie identified the problem he sought to solve much as he did in the Control Patents: "Unfortunately there is not a telecommunications system that can provide ATM switching on a call by call basis without

5

relying on the call processing and signaling capability of an ATM switch." *Id.* (1:67-2:3).

### D.    The "solution" claimed in Sprint's patents

In the "Summary" of his Control Patent invention, Mr. Christie proposed "[a]n embodiment of the present invention [that] solves this need by providing a method, system, and apparatus for communication control processing that is located externally to the switches that make the connections." JA0536 (3:34-37). To provide this functionality, he stated, "the present invention … includes a telecommunications processing system which comprises an interface that is external to the switches and is operational to receive and transmit signaling." *Id.* (3:53-56). In the Control Patents, he called this system the "communication control processor (CCP)" (JA0541 (13:36-38)) and characterized it as a dramatic improvement over the prior art (JA0544 (20:39-44)):

> The present invention represents a fundamental and powerful departure from previous telecommunications technology. By separating the communications path from communication control, the CCP can utilize different networks and network devices intelligently.

In the ATM Interworking Patents, Mr. Christie offered the same basic solution. To solve the "[u]nfortunate" lack of "telecommunications system[s] that can provide ATM switching on a call by call basis without relying on the call processing and signaling capability of an ATM switch" (JA0484 (1:67-2:3)), he proposed a "signaling processor" that would "receiv[e] the signaling" for a call, "process[] the signaling to select the virtual connection,[2] generat[e] new signaling to identify the particular connection and the selected virtual connection, and then transmit[] the new signaling to [an] ATM interworking multiplexer" (*id.* (2:14-19)). He settled on his signaling processor because, "[i]n this way broadband virtual connections can be provided to

---

[2] A "virtual connection" is a type of call routing—namely, a path that is dedicated to that call while it lasts. "Virtual connections" contrast to "connectionless" networks, where the routers connecting the two endpoints of a call are not dedicated to the call, and can be "dynamically" changed during the call depending on network conditions. Ex. C.

narrowband traffic on a call-by-call basis without requiring the call processing and signaling capability of an ATM switch." *Id.* (2:64-67).  The "[s]ignaling processing system" identified as an improvement over switches that combined processing and call control could be "any processing platform that can receive and process signaling to select virtual connections, and then … transmit signaling to identify selections."  JA0485 (4:21-24).  But the only "signaling processing system" disclosed in the patent was termed a "call/connection manager (CCM)."  JA0486 (5:49, 6:50-51).

The CCP of the Control Patents and the CCM of the ATM Interworking Patents both have two fundamental features.  *First*, the CCP/CCM must be capable of establishing an end-to-end communications path through an entire network on a call-by-call basis.  Indeed, the objective of the Control Patents' "system" is "providing communications control," which is "the process of setting up a communications path … between network elements." JA0525 (abst.); JA0535 (1:37-46).  That function is performed by "the CCP," which "selects the network elements … that comprise the communications path."  JA0537 (6:23-25).  By performing that routing function, "the CCP can … make the call connection from origination to destination."  JA0545 (21:7-10).

The "CCM" too "receives and processes telecommunications call signaling and control messages to select connections that establish communications paths for calls," and "can control routing."  JA0414 (21:21-40).  The CCM can set "connections through an ATM" network "on a call-by-call basis."  JA0470 (abst.).  "[W]hen a user places the call," the CCM "send[s] signaling for the call to the telecommunications system and … transmit[s] user information to the telecommunications system over a particular connection."  JA0484 (2:5-11).  "The invention"—the "CCM"—thus "allows switching over an ATM fabric on a call by call basis."  JA0496 (25:20-21).

*Second*, and just as critically, the CCP/CCM must be able to provide that end-to-end,

call-by-call routing functionality from *outside* the network path.  As the Control Patents assert, "the CCP allows a telecommunications network to *separate* communication control from the communications path."  JA0538 (8:19-20) (emphasis added); *see* JA0544 (20:26-28).  "By using the CCP, telecommunications systems can control communications *independently* of the capability of the switches" that make up the path.  JA0538 (8:28-32) (emphasis added).

To Mr. Christie, the CCP's ability to "*separate* the communications path from communication control" was his "invention['s] *fundamental* and powerful departure from" the prior art.  JA0544 (20:34-44) (emphasis added).  During prosecution, Sprint overcame obviousness rejections over systems in the prior art that "place[d] the entire server architecture into communication switch[es]" by arguing: "This is just the complexity that the [claimed] invention[] seeks to avoid."  JA0356.  It is only by this "fundamental" separation that "the CCP" is able to "utilize different networks and network devices intelligently."  JA0544 (20:42-44).  Mr. Christie's "invention" thus purports to "solve[] th[e] need" discussed above by locating the CCP "*externally* to the switches that make the connections."  JA0536 (3:34-37) (emphasis added); JA0544 (20:28-31).

The ATM Interworking Patents likewise stress that separation from the network path is a fundamental feature of the CCM.  As those patents explain, a key "[a]dvantage[]" of the CCM "invention" is that it "does not require call processing capability in an ATM switch," and therefore "enables networks to implement ATM switching without" them.  JA0496 (25:20-28).  Indeed, as noted above, the "signaling processing system" of "the invention"—of which the CCM is the sole disclosed embodiment—is proposed precisely in order to solve the problems that arise when switches serve both as elements in a call path and as the call control intelligence for the network.  JA0484 (2:5-67).  Thus, as with the CCP, a central characteristic of the CCM is that it

is not a part of, but rather is separated from, the devices that make up the telecommunications path.

### E.    Judge Lungstrum's opinions

Sprint has asserted these patents in several other lawsuits, all of which have been heard by Judge John W. Lungstrum of the District of Kansas.   Judge Lungstrum has consistently agreed with Sprint that the "processing system" limitations can be assigned their ordinary meaning, reasoning that the CCP and CCM are mere embodiments of the claimed invention.   *See* Exs. E, F, G (Judge Lungstrum claim construction opinions).

In *Sprint Communications Co. L.P. v. Comcast Cable Communications LLC* (Ex. G), Judge Lungstrum also declined to hold that the unconstrued "processing system" limitation is indefinite.   On that issue, he has apparently concluded that there is no law to "support the argument that such definition [of a structural term] by functional limitation renders a claim indefinite." *Id.* at 11 (observing that "method claims are clearly permissible").   He further concluded that the defendants in *Comcast* "failed to show that any particular patent *claim* (as opposed to a term) is invalid as indefinite." *Id.*   In finding that the term's "plain meaning" was sufficient, he relied on a declaration from a Sprint expert who opined that a "processing system" was "a system that processes signaling to assist in call control," and on other telecommunications patents that used the term "processing system." *Id.* at 12.   And he ruled that it was permissible for the patent to contain the "processing system" limitation even if the patent provided no guidance as to whether there was any apparatus that could be used to perform the claimed functions without meeting the "processing system" limitation. *Id.*

As discussed below, Judge Lungstrum's conclusion that the CCP and CCM were mere embodiments of a broader invention is incorrect.   The CCP and the CCM *are* the invention of the Control and ATM Interworking Patents.   Indeed, the specifications are explicit about that.

Likewise, his finding that functionally claimed structures like Sprint's "processing system" can satisfy the definiteness requirement of § 112 is inconsistent with close to a century of law.

## ARGUMENT

Under *Nautilus*, if a patent is to "appris[e] the public of what is still open to them," it necessarily has to claim with sufficient precision to notify the world what does *and does not* infringe.  134 S. Ct. at 2129.  Patent claims may not create "'[a] zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims.'"  *Id*.  That is why a century of case law explicitly invalidates functional claiming of structural limitations.  Method claims without structural limitations are, of course, appropriate.  What is not appropriate is a patent that (1) explicitly requires a claimed method to be practiced using a specified apparatus or system, but (2) contains no guidance as to what that apparatus or system might be.  That is why Judge Lungstrum erred in requiring the *Comcast* defendants "to show that any particular patent *claim* (as opposed to a term) is invalid as indefinite."  A claim with an indefinite term is, by virtue of that fact, indefinite; the public cannot know when the claim is or is not infringed.

The fact that "processing system" appears in other patents is immaterial to whether it is meaningful here.  The specifications of *these* patents identify both the problem that "the invention" was to solve—the need to separate call control from the call path—and the devices that solved it—the CCP and CCM.  But they fail at the moment of truth:  They do not disclose what those devices *are*.  And an inventor's efforts to stake an unbounded right to exclude others from resorting to solutions that he did not disclose or clearly claim is precisely what § 112 precludes.

As shown in Part I, structural limitations described only by their function have long been held indefinite.  As shown in Part II, "processing system" connotes no structure beyond an undefined "system" that performs undefined "processing."  The term is thus facially indefinite—it has no "plain and ordinary" meaning.  As shown in Part III, Cox's construction at least defines the

term as the specifications require:  The CCP and CCM are the only "processing systems" even mentioned, and are characterized as "the invention."  But even Cox's construction cannot save the patents, which disclose no structure for the CCP/CCM, and thus remain hopelessly indefinite. Thus, the Court should grant partial summary judgment of invalidity in Cox's favor.

## I. Under longstanding Supreme Court and Federal Circuit precedent, structural claim limitations that are described only by their function are fatally indefinite.

A.  Claims that purport to impose structural limitations using functional language have long been indefinite.  The Supreme Court's 1928 decision in *Holland Furniture Co. v. Perkins Glue Co.* is a classic articulation of this rule, recognizing that even then it was already "well understood" that any "attempt to describe a patentable device or machine in terms of its function" is "insufficient, and, if allowed, would extend the [patent] monopoly beyond the invention."  277 U.S. 245, 257-58 (1928).  Subsequent cases have reaffirmed "that a patentee may not broaden his product claims by describing" his claimed invention—"to the exclusion of any structural definition"—"in terms of function."  *Gen. Elec. Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 371 (1938).  Claims that provide only "suggestions of the functions of the [claimed] product … fall afoul of th[at] rule," which stems from § 112(b)'s "requirement of particularity and distinctness." *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 234, 236 (1942).  Such claims fail "clearly [to] circumscribe what is foreclosed from future enterprise."  *Id.*

The Federal Circuit likewise bars "purely functional claiming" of structural limitations because it "fail[s] to fulfill [§ 112(b)'s] 'public notice function' … by 'particularly pointing out and distinctly claiming' the invention."  *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1315-16 (Fed. Cir. 2011).  Even before *Nautilus*—when claims were indefinite only if "insolubly ambiguous"—functional claims "without … corresponding structure" were "indefinite."  *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

11

B.  By imposing a much stricter definiteness standard, *Nautilus* underscored the continued vitality of this rule.  As the Court explained, § 112(b) "require[s] that a patent's claims. . . inform those skilled in the art about the scope of the invention with *reasonable certainty*."  134 S. Ct. at 2129 (emphasis added).  That is, "a patent must be precise enough to afford clear notice of what is claimed, thereby '*apprising the public of what is still open to them*.'"  *Id*. (citation omitted) (emphasis added).  "The limits of a patent," the Court continued, "must be known for the protection of the patentee, the encouragement of the inventive genius of others and the assurance that the subject of the patent will be dedicated ultimately to the public."  *Id*. at 2129 n.6 (quoting *Wabash*, 304 U.S. at 369).  In short, "[a patent] monopoly is a property right," and, "like any property right, its boundaries should be clear."  *Id*. at 2124 (quotations omitted).  And while "absolute precision is unattainable," the law does not permit "'[a] zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims.'"  *Id*. at 2129 (quoting *United Carbon*, 317 U.S. at 236).

Both this district and others have already recognized that *Nautilus* strengthens the bar on purely functional claiming of structural limitations.  As this Court held in addressing the term "'processing means,'" when a "term lacks sufficient structure" because it is defined only as "performing the claimed function," that term is "indefinite" for failing to limit "'the scope of an invention with reasonable certainty.'"  *Hand Held Prods.*, 2014 WL 5779416, *2-3 (quoting *Nautilus*, 134 S. Ct. at 2129); *accord*, *e.g.*, *Fla. Atl. Univ. Research Corp. v. Acer, Inc.*, 2014 WL 2960968, *1 (S.D. Fla. June 30, 2014).

C.  The rule against functional claiming has just one "limited exception."  *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1317 (Fed. Cir. 2013).  If the term is construed as a "means-plus-function" limitation under § 112(f), its validity can be saved, but *only* if the patent's

12

specification "contain[s] sufficient descriptive text" for a skilled artisan to "know and understand what structure corresponds to the means limitation." *Id.* (citations omitted). In short, Congress "authorized functional claiming," but it did so "with limits." *Halliburton*, 514 F.3d at 1256 n.7.

The *en banc* Federal Circuit has thus explained that, "if one employs means-plus-function" claiming, any failure to "set forth in the specification an adequate disclosure showing what is meant by that language" is a "fail[ure] to particularly point out and distinctly claim the invention." *In re Donaldson Co.*, 16 F.3d 1189, 1195 (Fed. Cir. 1994) (en banc). In return "for allowing the patentee to claim [a structure] in terms of function," it is "[t]he *duty* of a patentee to *clearly link* or associate structure" in the specification "with the claimed function"—that "price … *must* be paid." *Med. Instrumentation*, 344 F.3d at 1211 (quotation omitted; emphasis added).

## II.   Sprint's "plain and ordinary" construction cannot be correct, because the claimed "processing system" is described only by its function—it is indefinite on its face.

According to Sprint, the "processing system" limitation that is ubiquitous in the patent claims here need not be construed. By Sprint's lights, the phrase's "plain" meaning (1) may not be circumscribed by the specification, and (2) holds no special significance for those of ordinary skill in the art. But especially when "disputed words describe technology, the terse usage of patent claims often requires 'construction' in order to define and establish …. the boundaries of the patented subject matter." *Fenner Invs., Ltd. v. Cellco P'ship*, 2015 WL 570730, *3 (Fed. Cir. Feb. 12, 2015). Sprint's position cannot be correct. The unconstrued phrase "processing system" is devoid of structure—it is purely functional—and thus is not "precise enough to afford clear notice of what is claimed." *Nautilus*, 134 S. Ct. at 2129.

Consider claim 1 of the '3,561 patent. It is directed to a "method of operating a *processing system* to control a packet communication system for a user communication." The rest of the claim describes various functions that need to be performed by the "processing system" in

controlling the "communication system"—for example, "receiving," "processing," "generating," and "transferring" various "message[s]." The problem is, the "processing system" that performs these functions need not have any structural features at all, so long as it can carry out the claimed functionality. Thus, we know what it *does*, but not what it *is*.

Under *Nautilus*, the controlling inquiry is whether this claim language gives members of the public "clear notice" as to "what is still open to them" (134 S. Ct. at 2129) (citation omitted) if they wish to perform the recited functions—*e.g.*, to "control a packet communication system" —by utilizing some device *other than* the claimed "processing system." Or, conversely, do the claims leave the public in the "zone of uncertainty" that *Nautilus* and § 112(b) preclude? *Id.*

The answer, on Sprint's non-construction of the "processing system" limitation, is the latter. Under Sprint's proposal, "a '[processing system]' could be *any* device that [processes]." *Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1214 (Fed. Cir. 1998) (emphasis added). Thus, to state Sprint's position is to refute it, because a limitation "cannot be construed so broadly [as] to cover every conceivable way or means to perform [a] function." *Id.*

Nor can "the other words" in the claims rehabilitate that "non-structural, 'nonce'" term. *Robert Bosch LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099 (Fed. Cir. 2014). Those words "do nothing more than identify ['processing'] functions for the '[system]' to perform." *Id.* Even if Cox's networks performed each claimed function, it would still be impossible to know whether Cox infringed, as claim 1 does not "particularly" and "distinctly" "claim" what the "processing system" *is*, as § 112(b) requires, and one cannot, therefore, know whether Cox's networks perform those functions by using one.

Perhaps Sprint could have drafted its claims as pure method claims, without identifying any structure. But whether for prior art reasons or because it realized that its claimed method

14

could only be implemented using a particular structure, Sprint chose not to do so. Instead, the claims require that various steps be performed by a "processing system." Thus, there is no infringement if no "processing system" is used to perform the claimed functions. Yet this begs the question: How might one perform the claimed functions *without* also meeting the "processing system" limitation? And if that limitation is completely unbounded, what "is still open" to "the public"? The "processing system" limitations do not tell us—they simply create an impermissible "zone of uncertainty."

### III. Only Cox's alternative construction is consistent with the patent specifications, but even that correct construction cannot save Sprint's claims from indefiniteness.

Unlike Sprint's "plain meaning" proposal, Cox's alternative construction at least begins to give the phrase "processing system" some prima facie meaning by grounding it in the disclosures of the specifications. But ultimately, even Cox's construction is insufficient to rehabilitate Sprint's patents, which fail to disclose sufficient structure to avoid partial summary judgment.

### A. The only "processing system[s]" the patents describe are the CCP and CCM: external devices that can control routing from outside the network path.

"It is axiomatic that … [c]laim language must always be read in view of the written description." *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011). "[T]he specification is always highly relevant." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc). "Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* Where a term could have "several common meanings," it "point[s] away from the improper meanings and toward the proper meaning." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It is "[t]he foundation of judicial claim construction," and "'[d]escrib[ing] the features of the 'present invention' as a whole … limits the scope of the invention.'" *Fenner*, 2015 WL 570730, *3 (quoting *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007)).

15

Here, the specifications acknowledge that the claimed "processing system" *is* the "CCP"/"CCM," which Mr. Christie consistently highlighted as his sole "invention." *Supra* 5-8. The subject matter of the Control Patents, for example, is a "system" for routing "communication paths" (JA0513 (1:24-3:31)), and the "invention" is an allegedly novel device—the "CCP"— which controls how those paths are established JA0515-19 (6:8-7:9; 7:20-30; 8:11-34; 9:14-50; 10:25-45; 11:48-57; 12:5-13:12; 13:28-52)). In fact, the CCP is the *only* device described in the specification that is identified as being novel at all. JA0517 (10:11-14). And Mr. Christie specifically characterized the CCP as the point at which his invention "depart[ed]" from the prior art. JA0522 (20:47-49). Likewise, the sole "invention" of the ATM and Feature Patents is a "system" that routes virtual connections through an ATM network. The ATM Patent specifications explain that the "signaling processing system" of the patent can be "any processing platform that can receive and process signaling to select virtual connections. JA0485 (4:21-24). But the only "processing system" disclosed in the patent to perform that function is the "CCM." JA0486 (6:50-51).

As the specifications repeatedly emphasize, the two critical features of the CCP/CCM are that (1) it can establish a communication path through the entire network on a call-by-call basis, and (2) it is external to the path architecture. As Mr. Christie maintained, the "*fundamental*" aspect of his "invention"—the key feature that supposedly enables it to route communications from one type of network to another—is its "*separati*[*on*] [of] the communications path from communication control." JA0544 (20:40-45) (emphasis added). Indeed, both in the specifications and during prosecution, he singled out that separation as the singular "[a]dvantag[e]" of his "invention" over the prior art's "complexity." JA496 (25:20-28); JA415 (23:7-8); JA0356.

"The claims … must be read in light of the specification's consistent emphasis on this

fundamental feature of the invention." *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1324 (Fed. Cir. 2008).  "In light of th[e] clear statements in the specification that the invention … is directed to" a device that (1) *can establish a call path on a call-by-call basis* and (2) is *external* to the network path, the Court "cannot read the claims … to encompass" devices that *do not* have these features—the exact characteristics used to distinguish Mr. Christie's "invention" from the prior art. *Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004).  Each patent's "specification" thus "leads to the inescapable conclusion that" a device must perform the claimed routing functions and that the routing operation "must occur" externally from the network path architecture.  *Id.* (quotation omitted).  That leaves the question, however, whether even a proper construction of "processing system" is definite enough to satisfy §112(b).  The answer is "no."[3]

B. **Even under Cox's correct construction, "processing system" remains indefinite, because Sprint's patents disclose no structure for the CCP/CCM.**

Although Sprint's patent specifications clearly link the "processing system" limitation to the CCP or CCM, they consistently describe those devices only in terms of their *function*—not their *structure*.  Thus, the specifications do not solve the "processing system" limitations' basic problem: there is no way to understand what *structures* are claimed and, hence, no limit on the claims' putatively structural terms other than functional limits, which are legally insufficient.

1. Starting with the Control Patents, their common specification tells us that the claimed functions are performed by the "CCP," and that "[t]he CCP is a processing system."  JA0519 (13:40).  The specification then adds that "those skilled in the art are aware that such [pro-

---

[3] Sprint failed to use the "means plus function" language that presumptively invokes § 112(f), but the claims would need to be construed the same way even under that provision.  Where a limitation "refers only to a general category of whatever may perform specified functions," § 112(f) "commands a construction of the limitation as referring to specification-identified corresponding structures."  *Robert Bosch*, 769 F.3d at 1099.

cessing] systems can be housed in a single device or distributed among several devices." *Id.* (13:40-45). But learning that a "processing system" is a "CCP," which in turn is a "processing system" that "can be … housed in a …. device," does not provide any additional understanding of what structure is claimed.

The specification does offer "one example of a CCP device"—"a Tandem CLX machine configured in accord with this disclosure." *Id.* (13:50-52). So apparently a "processing system" can be a properly configured computer. "With this lone example," however, "a skilled artisan is still left to wonder what other" devices or computers might qualify, or—more importantly— might *not* qualify. *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1374 (Fed. Cir. 2014). "The specification offers no indication," and the resulting "ambiguity falls within 'the innovation-discouraging 'zone of uncertainty' against which [*Nautilus*] warned.'" *Id.*

Post-*Nautilus* cases confirm this. In *In re: TR Labs Patent Litigation*, MDL No. 2396, Dkt. 295 (D.N.J. July 14, 2014), the court invalidated a claim tethered to a far more explanatory specification. The claim called for "a strategy that increases and optimizes demand served by the telecommunications network." Ex. H at 3 (emphasis omitted). Nearly a dozen passages in the specification identified factors for achieving that "optimiz[ation]," yet the court held that the patent merely "identifies a host of possible constraints without 'particularly pointing out and distinctly claiming the [invention's] subject matter.'" *Id.* at 7. Because it "would cover the very concept of optimization" and "does not set forth specific criteria by which to *optimize* demand served," the claim was "indefinite[]." *Id.* at 7, 10. Sprint's "processing" claims fare no better.

2. In addition, even for the specification's one example of a CCP device, neither the patent nor its file history offers any guidance as to the requisite "configur[ation]" of the Tandem CLX, or how to implement it. Thus, the intrinsic evidence fails to provide "corresponding struc-

ture" for the CCP, as required by the functional claiming law and, as relevant, § 112(f).

Indeed, where patentees have "invoked means-plus function claiming, [the Federal Circuit] has consistently required that the structure disclosed in the specification be more than simply a general purpose computer." *Aristocrat*, 521 F.3d at 1333. "Because general purpose computers can be programmed to perform very different tasks in very different ways, simply disclosing a computer as the structure designated to perform a particular function does not limit the scope of the claim … as required by" § 112(f)—it amounts to "pure functional claiming." *Id*. The idea that "it [i]s not necessary for the patent to designate any particular algorithm to perform the claimed function … is contrary to [Federal Circuit] law." *Id*. at 1334; *see id*. at 1337-38.

In *Augme Techs., Inc. v. Yahoo! Inc.*, for example, the Federal Circuit confirmed that a patent claiming a computer-implemented means for performing a recited function must specify *how* the claimed device performs that functionality: "Simply disclosing a black box that performs the recited function is not a sufficient explanation of the algorithm required to render the means-plus-function term definite." 755 F.3d 1326, 1338 (Fed. Cir. 2014). Rather, as a decision of this district explained in holding the term "'processing means'" indefinite, "the patent must disclose an algorithm *for performing the claimed function*." *Hand Held Prods*., 2014 WL 5779416, *2 (emphasis added). And while "'processing'" in general "is a function that can be performed by a general purpose computer," if a "particular function" is claimed, "special programming" is "requir[ed]." *Id*.

So too here. The specification tells those skilled in the art only that the "processing system" is a general-purpose computer configured to "perform[] many functions." JA0519 (13:29). *How* this general-purpose machine is "configured" is not disclosed. Nothing in the patent or the file history indicates how the processing system selects network elements or connections; how it

generates control instructions; or how it "processes" information received from elsewhere in the network. Nor does the intrinsic evidence disclose programming or algorithms sufficient for this computer to perform its required functions. All we know is that this computer controls the "packet communication system" for a "user communication." JA0523 (cl. 1). That is not enough. And even if it were, the claims would at least need to "be limited" to "the corresponding structure ... described in the specification." *Robert Bosch*, 769 F.3d at 1101.

3. Nor is it sufficient that, as Sprint argued in the *Comcast* case, a skilled artisan could figure out the relevant algorithm in programming a general-purpose computer to perform those tasks. This conflates the doctrines of enablement and definiteness. A patentee has not made "a sufficient disclosure of structure for means-plus-function purposes," merely "because … one of ordinary skill in the art could build the device claimed in the … patent based on the disclosure in the specification." *Aristocrat*, 521 F.3d at 1336. Unlike the enablement rule, a § 112(f) structural disclosure "serves the very different purpose of limiting the scope of the claim to the particular structure disclosed"—to prevent "pure functional claiming." *Id.* Indeed, "[t]hat ordinary skilled artisans could carry out the recited function in a variety of ways is precisely why claims written in 'means-plus-function' form must disclose the particular structure that is used to perform the recited function." *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1385 (Fed. Cir. 2009).

Sprint cannot take credit for inventing a system for performing a function without limiting its claim to the inventive way in which that function is performed. It is precisely the choices made by skilled artisans in solving the problems to which Sprint's patents are addressed that constitute an invention. Simply identifying desirable functionality and asking the world to figure out how to implement it does not allow Sprint to claim a patent monopoly on others' solutions.

4. The problem with the Control Patents is repeated in the ATM Interworking Patents.

Claim 1 of the '429 Patent and claim 1 of the '064 Patent each call for a "processing system." Yet the closest the intrinsic evidence comes to identifying something that performs the functions claimed for the "processing system" is in the patents' description of the "call/connection manager" or "CCM."  JA0486 (6:50-55); JA0488 (10:56-65).  As with the "processing system" limitations in the Control Patents, even if the CCM were illustrative of the meaning of the "processing system" limitations, the specifications fail to define the CCM in terms beyond its claimed functions.  Thus, the claims remain structurally unbounded—and are indefinite under § 112(b) and *Nautilus*.

## CONCLUSION

The Court should hold that the term "processing system" is indefinite, and grant partial summary judgment of invalidity to Cox on the Control Patents and ATM Interworking Patents.

Dated:  April 9, 2015

Respectfully submitted,

*/s/ David A. Bilson*
John C. Phillips, Jr. (Bar No. 110)
David A. Bilson (Bar No. 4986)
PHILLIPS, GOLDMAN & SPENCE,
P.A. 1200 North Broom Street
Wilmington, Delaware 19806
(302) 655-4200
jcp@pgslaw.com
dab@pgslaw.com

*Of Counsel*:

*Attorneys for Plaintiffs*

WINSTON & STRAWN LLP
Michael L. Brody
James Winn
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600 (t) / (312) 558-5700 (f)
mbrody@winston.com
jwinn@winston.com

David S. Bloch
101 California Street
San Francisco, California 94111
(415) 591-1452 (t) / (415) 591-1400 (f)
dbloch@winston.com

Pejman F. Sharifi
Krishnan Padmanabhan
200 Park Avenue
New York, New York 10166
(212) 294-6700 (t) / (212) 294-4700 (f)
psharifi@winston.com
kpadmanabhan@winston.com

Steffen N. Johnson
Eimeric Reig-Plessis
1700 K Street, N.W.
Washington, D.C. 20006
(202) 282-5000 (t) / (202) 282-5100 (f)
sjohnson@winston.com
ereigplessis@winston.com