# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| COX COMMUNICATIONS INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No. 12-487-JFB |
| | ) | |
| SPRINT COMMUNICATIONS COMPANY L.P., et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

David A. Bilson, Esquire, and John C. Phillips, Jr., Phillips, Goldman, McLaughlin & Hall, P.A., Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: David S. Bloch, Esquire, Michael L. Brody, Esquire, Krishnan Padmanabhan, Esquire, Pejman F. Sharifi, Esquire, Jaime Simon, Esquire, and James Winn, Esquire of Winston & Strawn LLP.

Richard K. Herrmann, Esquire, and Mary Matterer, Morris James LLP, Wilmington, Delaware. Counsel for Defendants. Of Counsel: Jordan T. Bergsten, Esquire, Ryan D. Dykal, Esquire, Aaron E. Hankel, Esquire, David Morehan, Esquire, Robert H. Reckers, Esquire, Mark D. Schafer, Esquire, Ryan J. Schletzbaum, Esquire, and Basil Trent Webb, Esquire of Shook, Hardy & Bacon LLP.

## MEMORANDUM OPINION

October 20, 2017
Wilmington, Delaware

**BATAILLON, Senior District Judge**

## I. INTRODUCTION

In this patent case filed by Plaintiff Cox Communications, Inc. ("Plaintiff" or "Cox") against Defendant Sprint Communications Company, L.P. ("Defendant" or "Sprint"), Sprint alleges that Cox infringes certain Sprint telecommunications and data networking patents. Among these patents are U.S. Patent Nos. 7,286,561 ("the '6,561 patent"), 6,633,561 ("the '3,561 patent"), 6,463,052 ("the '052 patent"), and 6,452,932 ("the '932 patent") (collectively the "Call Control Patents"). District Judge Sue L. Robinson construed various claim terms from the Call Control Patents in March 2016, (D.I. 399; D.I. 400), and May 2017, (D.I. 541). Upon Judge Robinson's retirement from the bench, the case was reassigned to the undersigned on June 16, 2017. (D.I. 557) A pre-trial conference is scheduled for November 17, 2017, with a jury trial set to begin on December 7, 2017. (D.I. 603; D.I. 654)

As part of its defense, Cox contends that the Call Control Patents are invalid as anticipated by several prior art "systems" as well as a number of prior references. (D.I. 609, ex. 3) Two of these allegedly anticipating references are groups of multiple publications that comprise—what Cox alleges to be—"the Weinstein prior art" and "the Weinstein-Forgie prior art." (D.I. 583, ex. 3 at ¶¶ 1105, 1296) Sprint has moved for partial summary judgment of no invalidity for the Call Control patents, related to theories of anticipation and obviousness, with respect to these alleged anticipating references. (D.I. 582)

## II. STANDARD OF REVIEW

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 415 U.S. 475, 586 n. 10 (1986). A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed

must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita, 415 U.S. at 587 (internal quotation marks omitted). The court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 415 U.S. at 586–87; see also Podobnik v. U.S. Postal Service, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). Although the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," a factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249–50 (internal citations omitted); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

### B. Invalidity

#### 1. Anticipation

Under the Patent Act, "[a] person shall be entitled to a patent unless . . . the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for the patent[.]" 35 U.S.C. § 102(a). The statute also prevents patenting when "the invention was patented or described in a printed publication in this or a foreign country . . . more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). The Federal Circuit has stated that "[t]o anticipate a claim, a single prior art reference must expressly or inherently disclose each claim limitation." *Finisar Corp. v. DirecTV Grp. Inc.*, 523 F.3d 1323, 1334–35 (Fed. Cir. 2008) (quoting *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998)). "Anticipation requires that the reference describe not only the elements of the claimed invention, but also that it describe those elements arranged as in the claim." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1343 (Fed. Cir. 2016) (internal quotations omitted).

"The explicit claim limitations must be considered in [the] determination of anticipation." *In re Schreiber*, 128 F.3d 1473, 1481 (Fed. Cir. 1997). In determining whether a patented invention is explicitly anticipated, "the proponent must show 'that the four corners of a single, prior art document describe every [limitation] of the claimed invention,'" "arranged or combined in the same way as in the claim." *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1370 (Fed. Cir. 2008). The claims are read in the context of the patent specification in which they arise and in which the invention is described. *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1554 (Fed. Cir. 1995). The prior art need not be ipsissimis verbis (i.e., use identical words as those recited in the claims) to be anticipating. *Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707, 716 (Fed. Cir. 1984). Anticipation, an invalidity defense, must be proven by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd.*, 564 U.S. 91, 95 (2011).

### a. Incorporation by reference

Anticipating prior art must disclose "every [limitation] of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Advanced Display Sys. Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000) (citations omitted). In addition, "[m]aterial not explicitly contained in the single, prior art document may still be considered for purposes of anticipation if that material is incorporated by reference into the document." *Id.* (citation omitted) "Incorporation by reference provides a method for integrating material from various documents into a host document . . . by citing such material in a manner that makes clear that the material is effectively part of the host document as if it were explicitly contained therein." *Id.* (citations omitted). For example, a patent application may incorporate by reference "matter elsewhere written down . . . for economy, amplification, or clarity of exposition, by means of an incorporating statement clearly identifying the subject matter which is incorporated and where it is to be found." *In re Seversky*, 474 F.2d 671, 674 (C.C.P.A. 1973). "[A] mere reference to another application, or patent, or publication is not an incorporation of anything contained therein[.]" *Id.*

Put another way, the host document "must cite the material in a manner that makes clear that it is effectively part of the host document as if it were explicitly contained therein." *Advanced Display Systems*, 212 F.3d at 1282. It must, therefore, both (1) "identify with detailed particularity what specific material it incorporates"; and (2) "clearly indicate where that material is found in the various documents." *Id.* (citations omitted). While anticipation is a question of fact, the question of "[w]hether and to what extent material has been incorporated by reference into a host document is a question of law. *Id.* at 1283 (citation omitted). "[T]he standard of one reasonably skilled in the art should be used to determine whether the host document describes the material to be incorporated by reference with sufficient particularity." *Id.*

## 2. Obviousness

"A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a). Obviousness is a question of law, which depends on underlying factual inquiries.

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 406 (2007) (quoting Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 17–18 (1966)).

"[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." KSR, 550 U.S. at 418. Likewise, a defendant asserting obviousness in view of a combination of references has the burden to show that a person of ordinary skill in the relevant field had a reason to combine the elements in the manner claimed. Id. at 418–19. The Supreme Court has emphasized the need for courts to value "common sense" over "rigid preventative rules" in determining whether a motivation to combine existed. Id. at 419–20. "[A]ny need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." Id. at 420. In addition to showing that a person of ordinary skill in the art would have had reason to attempt to make the composition or device, or carry out the claimed process, a defendant must also demonstrate that "such a person would have had a reasonable expectation of success in doing so." PharmaStem Therapeutics, Inc. v. ViaCell, Inc., 491 F.3d 1342, 1360 (Fed. Cir. 2007).

A combination of prior art elements may have been "obvious to try" where there existed "a design need or market pressure to solve a problem and there [were] a finite number of identified, predictable solutions" to it, and the pursuit of the "known options within [a person of ordinary skill in the art's] technical grasp" leads to the anticipated success. *Id.* at 421. In this circumstance, "the fact that a combination was obvious to try might show that it was obvious under § 103." *Id.*

A fact finder is required to consider secondary considerations, or objective indicia of nonobviousness, before reaching an obviousness determination, as a "check against hindsight bias." *See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1079 (Fed. Cir. 2012). "Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham*, 383 U.S. at 17–18.

"Patents are presumed to be valid, and overcoming that presumption requires clear and convincing evidence." 35 U.S.C. § 282; *Spectrum Pharm., Inc. v. Sandoz Inc.*, 802 F.3d 1326, 1333 (Fed. Cir. 2015) (citing *Microsoft Corp. v. i4i Ltd. P'ship.*, 564 U.S. 91, 95 (2011) (holding that an invalidity defense must be proved by clear and convincing evidence)). In conjunction with this burden, the Federal Circuit has explained that,

> [w]hen no prior art other than that which was considered by the PTO examiner is relied on by the attacker, he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents.

*PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008) (citations omitted).

## III. DISCUSSION

### A. The Anticipating References

Cox's expert, Scott Bradner ("Bradner") identified two anticipating references. The first, "Clifford J. Weinstein's 1983 paper *The Experimental Integrated Switched Network a System-Level Network·Test Facility* . . . [Weinstein-83a] described the work of the ARPA Packet Speech Program." (D.I. 583, ex. 3 at ¶ 1100) He called this document "[Weinstein-83a]" ("Weinstein" or the "Weinstein paper"). (*Id.*) The second, is a "December 1983 IEEE paper *Experience with Speech Communication in Packet Networks* by Clifford J. Weinstein and James W. Forgie[,]" which Bradner also called "[Weinstein-83b]" ("Weinstein-Forgie" or the "Weinstein-Forgie paper"). (D.I. 583, ex. 3 at ¶ 1293)

With respect to Weinstein, in his expert report, Bradner identified four publications that are referenced within the paper and three other publications (that are not identified within Weinstein) to comprise the "Weinstein prior art[.]" (D.I. 583, ex. 3 at ¶¶ 1100–1105) Bradner explained that he based his anticipation analysis upon his belief "that a document plus the references – are one – can be seen as one document[]" and forms "one body of material" (D.I. 583, ex. 4 at 133:14–134:9) As to the "Weinstein-Forgie prior art[,]" Bradner combined Weinstein-Forgie with eight publications referenced in the paper to create a single document for anticipation purposes. (D.I. 583, ex. 3 at ¶¶ 1293–97) At his July 2017 deposition, Bradner reiterated this point and explained that the "Weinstein prior art" is "one body of material[,]" (D.I. 583, ex. 4 at 134:9), and that the same logic applies to the "Weinstein-Forgie prior art[,]" (*id.* at 282:6–283:12).

### 1. Bradner's incorporation by reference theory

At his deposition, Bradner was asked about how he went "about selecting certain of the references" for incorporation by reference into the Weinstein and Weinstein-Forgie papers. Bradner explained that he "looked at the reference -- looked at all of the references [he] could get

ahold of, which wasn't all of them, and [he] looked at them to see whether they had . . . material relevant to the particulars of the claims."  (D.I. 583, ex. 4 at 282:17–21)

## B.  The Arguments

Sprint argues that Bradner concedes that neither the "Weinstein paper" nor the "Weinstein-Forgie paper[,]" within its four corners, anticipates any asserted claim of the patents-in-suit.  (D.I. 583 at 2, 7, 8–9)  Sprint notes that neither of the papers employ the term "incorporate by reference," nor do they meet the legal standard for incorporating by reference.  (*Id.* at 9–10)  Cox responds that it is possible to incorporate documents by reference and cites to case law to establish the premise.  (D.I. 609 at 6–7)  Specifically, Cox avers that the two "Weinstein Articles [] cite to additional documents – written by the same researchers, about the same body of research – to explain in more detail the 'circuit' components, 'packet' components, and the 'interface' between the two."  (*Id.* at 8 (emphasis omitted))  Cox also points out that Bradner opined that "a person of ordinary skill in the art would have understood the cited references to be part of the disclosure of the Weinstein Articles because they are 'descriptive studies that the paper is also describing.'"  (*Id.* at 9)  The briefs do not provide an opinion from Sprint's expert, Dr. Stephen Wicker ("Dr. Wicker"), which Cox contends "leav[es] little question that summary judgment is inappropriate."[1]  (*Id.*)

The dispute, therefore, is "whether the Weinstein and Weinstein-Forgie [p]apers (the "host" documents) incorporate the cited documents by reference; and [] to what extent the 'specific material' was ostensibly incorporated [into these host documents]."  (D.I. 621 at 2 (footnote omitted))  The case law is clear that, while anticipation is a factual question for the jury, "if incorporation by reference comes into play in an anticipation determination, the court's role is to determine what material in addition to the host document constitutes the single

---

[1] Sprint argues that the undisputed facts are sufficient to warrant summary judgment, because Cox cannot "show that the cited documents were incorporated with the specificity, particularity, and clarity the law demands." (D.I. 621 at 2–3)

reference." *Advanced Display Systems*, 212 F.3d at 1283. To this end, neither party has provided the Court with a complete version of Bradner's report and has instead submitted extracts of his opinions and deposition testimony.[2] (D.I. 583, ex. 3; D.I. 609, ex. 3; D.I. 635, ex. 2) Additionally, Cox identifies specific instances where the host documents cite to the allegedly incorporated references. (D.I. 635 at 5–8) The Court concludes that, for the purposes of anticipation, neither the "Weinstein prior art" nor the "Weinstein-Forgie prior art" (as described by Bradner) exists as a single reference.

### C. Weinstein

There are two deficiencies with the references that comprise the "Weinstein prior art": (1) references not identified in Weinstein, and (2) of the references contained in Weinstein, the citations lack specificity as described by the case law. *See Advanced Display Systems*, 212 F.3d at 1282–83.

#### 1. Unidentified references

The "Weinstein prior art" apparently includes as many as three references that are not identified in the host document (i.e., Weinstein). (D.I. 583, ex. 3 at ¶ 1103) Sprint points to two of these references, (D.I. 583 at 3–4, D.I. 621 at 3), and argues that the lack of reference in the host document precludes the presentation of these invalidity theories to the jury, (D.I. 621 at 7). Cox does not identify any case law supporting the proposition that a host document can incorporate by reference one or more documents that are not identified, cited, or otherwise referred to in the host document. Instead, Cox responds by explaining that these:

---

[2] Sprint avers that—based solely on the undisputed facts in the record—summary judgment is appropriate, because Weinstein and Weinstein-Forgie do not (on their own and within the four corners of the documents) anticipate the claims of the Call Control Patents. (D.I. 621 at 2-3) This, of course, misses the premise of incorporation by reference, in which properly-referenced materials become part of the host document and are (as a matter of law) within the four corners of the host document. (D.I. 609 at 6 & n.8)

> two additional documents are not necessary[3] to [] Bradner's
> opinion on the Weinstein reference. The first, LL-DSNTEP-AR-
> 83 is merely cited to provide a pictorial representation of
> disclosure contained in the Weinstein article, and the second, and
> LL-NSSTP-AR-80, is not cited for any limitation of any claim.[4]

(D.I. 635 at 8) In other words, Bradner's expert report, which referred extensively to the

anticipatory "Weinstein prior art" was predicated on a malleable definition as to what that prior

art is in the first place. While this may likely render useless much of Bradner's opinion with

respect to general anticipation by the "Weinstein prior art," it is, as Sprint acknowledges,

(D.I. 621 at 9), not dispositive of the entirety of those opinions as they relate to Weinstein and

specific target publications and documents that it may incorporate by reference. Moreover,

Bradner's report (and the supporting claim charts) provided additional detail with respect to

specific publications (allegedly incorporated by reference) and their significance to Bradner's

anticipation opinions as to specific claim limitations. (*See* D.I. 635, ex. 2) Neither party has

identified parts of the record in which LL-NSSTP-AR-80 is employed as part of Bradner's

anticipation analysis, therefore, the court focuses on the LL-DSNTEP-AR-83 publication below.

### a. LL-DSNTEP-AR-83

Bradner identified a September 30, 1983 Lincoln Laboratory report identified as "LL-

DSNTEP-AR-83" ("AR-83") as one of "three other references" that make up the "Weinstein

prior art[.]" (D.I. 583, ex.3 at ¶ 1103) Weinstein does not refer to this document. (D.I. 609, ex.

1) Bradner provided no explanation for how a person of ordinary skill in the art would read

Weinstein as incorporating AR-83 by reference. After the close of expert discovery, Cox waited

until its sur-reply brief to argue that AR-83 is "not necessary" to Bradner's opinion and "can

simply [] be dropped from the list of materials used for the Weinstein opinion." (D.I. 635 at 8 &

n.4). Anticipation (i.e., whether AR-83 is or is not "necessary") is a question of fact for the

---

[3] If reference to these documents is "not necessary," the Court struggles to understand why Bradner relied on them in the first place.

[4] Therefore summary judgment of no anticipation is appropriate with respect to LL-NSSTP-AR-80.
(D.I. 583, ex. 3 at ¶ 1103)

jury—a question of fact that Cox raised in presenting Bradner's report in the first place. Relevant portions of Bradner's report are now part of the record, and the Court's role in this instance is to address the question of whether (in the context of Cox's invalidity contention as described in detail in Bradner's report) Weinstein incorporates AR-83 by reference. *Advanced Display Systems*, 212 F.3d at 1283.

### i. Fourth limitation, claim 1 of the '052 patent

In a portion of Bradner's report supplied by Cox, Bradner addressed how Weinstein anticipates the fourth limitation of claim 1 of the '052 patent. (D.I. 635, ex. 2 at ¶¶ 1155–57) This claim limitation recites "transferring an instruction indicating the network code from the processing system to the device[.]" ('052 patent, 22:20–21) Bradner explained that "[t]he Weinstein prior art describes the RCP sending an instruction in CCS format to the PCI[]" and that "[t]he connection is shown" in this diagram from AR-83:



[LL-DSNTEP-AR-83] Figure 11 with the signaling path highlighted.

(D.I. 635, ex. 2 at ¶ 1156) However, without additional explanation, there is no basis for the inclusion of this figure by reference into Weinstein. *Advanced Display Systems*, 212 F.3d at 1282.

### ii. Conclusion: AR-83

As it relates to the fourth limitation of claim 1 of the '052 patent, Cox has failed to demonstrate that Weinstein incorporates AR-83 by reference. Therefore the combination of AR-83 and Weinstein does not anticipate claim 1 of the '052 patent.

### 2. Identified References

Cox identifies specific instances where Weinstein cites references 3, 4, and 5 and where "Bradner relie[d] on these cited documents for this exact purpose, to explain the techniques used for transmission of voice across the packet network." (D.I. 635 at 6–7 (citing *Id.*, ex. 2 at ¶¶ 1144, 1153, 1166))

Section I of Weinstein describes the context of the research project as follows:

> A [satellite] network testbed facility referred to as the Experimental Integrated Switched Network (EISN) has been established . . . [for testing and various experiments] The satellite network is shared between DCA and the Defense Advanced Research Project Agency (DARPA). **DARPA's primary experimental objectives are development and demonstration of techniques for efficient multiplexing of packet voice and data traffic [3, 4, 5] in an internetwork environment including wideband shared satellite links.** To support the DCA-oriented experiments, special satellite/terrestrial interfaces are provided at each site to link circuit-switched terrestrial facilities with the demand assigned satellite network. Initial EISN experiments [4] have utilized these interfaces along with emulated circuit switches to validate techniques for integration of satellite and terrestrial systems for alternate satellite/terrestrial routing and for call preemption.

(D.I. 609, ex. 1 at 449 (emphasis added))

### a. Reference [3]: Weinstein-82

Weinstein identifies Reference 3 as "C.J. Weinstein and H.M. Heggestad, 'Multiplexing of Packet Speech on an Experimental Wideband Satellite Network,' Proc. AIAA 9th Comm. Sat. Syst. Comp., San Diego, CA, March 7-11, 1982." (D.I. 609, ex. 1 at 455) Reference 3 does not

contain any specific information about where in the document the target reference information is to be found.  (*Id.*)  As discussed above, Reference 3 is included as part of a reference to three publications.  Bradner identified this publication as "[Weinstein-82]" ("Weinstein-82") in his report.  (D.I. 583, ex. 3 at ¶ 1102)

### i. Preamble, claim 1 of the '052 patent

Bradner incorporated Weinstein-82 into his analysis of how Weinstein anticipates the preamble[5] of claim 1 of the '052 patent, which recites "[a] method of transferring a user communication to a packet communication system, the method comprising[. . .]"  ('052 patent, 22:10–11)  According to Bradner, "[t]he Weinstein prior art describes a method of transferring user communication (e.g., speech) to a packet communication system (e.g., the WB SATNET)[.]"  (D.I. 635, ex. 2 at ¶ 1144)  Bradner identified Section II of Weinstein, entitled "Experimental System Description[,]" which includes the statement that, "Broadcast connectivity among the EISN sites is provided by the Wideband Satellite Network 3[6] (WB SATNET), a packet-switched satellite network with flexible Time Division Multiple Access (TDMA) access assignment."  (D.I. 609, ex. 1 at 450)  To illustrate this language, Bradner relied on Figure 1 from Weinstein-82, with WB SATNET highlighted:

---

[5] The parties have not argued whether the preambles of claim 1 of the '052 patent and of claim 1 of the '932 patent are limiting.  However, Bradner included detail of the preambles in his anticipation analysis (including the incorporation by reference of Weinstein-82), (D.I. 635, ex.2 at ¶¶ 1142–44), and Cox argues specifically that this part of his expert report supports Cox's incorporation by reference argument,  (D.I. 635 at 7 (identifying "¶ 1144" of Bradner's report as supporting the incorporation by reference of "#3[,]" which is Weinstein-82); (*see also* D.I. 609 at 2).  Without deciding the question of whether the preambles are limiting, the Court interprets Cox's argument as including the concept that the preambles are limiting.  Therefore, the Court concludes that a failure to prove (based upon the preambles) that Weinstein incorporates by reference Weinstein-82 is dispositive of Cox's anticipation theory with respect to that combination of references as to those specific claims.

[6] This appears to be the number "3" and not Reference "[3]" as formatted in Weinstein, which uses brackets to identify references.  (*See generally* D.I. 609)

14



Fig. 1. Integrated voice/data packet internetwork.

(D.I. 635, ex. 2 at ¶ 1144 (highlighting in Bradner's report))  Although Figure 1 of the Weinstein-82 reference depicts a network diagram including "WB SATNET[,]" which is discussed in Weinstein, it does not include the EISN network, which is the network that is the subject of Weinstein and which is discussed in relation to Reference 3.  (D.I. 609, ex. 1 at 449)  More specifically, Weinstein identifies Reference 3 in a sentence explaining that "DARPA's primary experimental objectives are development and demonstration of techniques for efficient multiplexing of packet voice and data traffic [3, 4, 5] in an internetwork environment including wideband shared satellite links."  (*Id.*)

One reading Weinstein would understand that Reference 3 (i.e., Weinstein-82) provides additional detail about "DARPA's [] experimental objectives" and "techniques for efficient multiplexing of packet voice and data traffic." However, Bradner, in his report, employed Weinstein-82 for the altogether different purpose of providing a contextual network map to accompany text from Weinstein that is in a different section of the paper and that does not identify Reference 3. (*Id.* at 450) Moreover, Weinstein includes its own Figure 1, which shows the interrelationship between the networks and specifically references the EISN:



Fig. 1. Experiment Integrated Switched Network (EISN) configuration illustrating WB SATNET subsystems, Packet/Circuit Interface, and Telephone Office Emulator.

(*Id.* (emphasis in Cox's original)) Bradner did not explain why a person of ordinary skill in the art would see the reference to Weinstein-82 on page 449 in Section I of Weinstein and understand that the reference identifies "with detailed particularity" that the cited text on page 450 in Section II of Weinstein incorporates Weinstein-82 by reference and that this general reference to Weinstein-82 "clearly indicate[s]" that (to the exclusion of Figure 1 of the host document) the referenced material includes Figure 1 of the Weinstein-82 (target) document. *See Advanced Display Systems*, 212 F.3d at 1282. Therefore, as it relates to the preamble of claim 1

of the '052 patent, the Court concludes that Weinstein does not incorporate Weinstein-82 by reference. For these reasons, the combination of Weinstein and Weinstein-82 does not anticipate the claim 1 of the '052 patent. *See Commonwealth Sci. & Indus. Research Organisation v. Buffalo Tech. (USA), Inc.*, 542 F.3d 1363, 1372 (Fed. Cir. 2008) [hereinafter "*Commonwealth Scientific*"] (explaining that a "footnote citation in [a host document] could provide a justification for combining the references for obviousness purposes, but there is nothing about the reference to [a target document] that appears to constitute an incorporation of any or all of the information from [that] reference.").

### ii. Preamble, claim 1 of the '932 patent

Bradner based his analysis as to claim 1 of the '932 patent on his analysis of claim 1 of the '052 patent, including the preamble of claim 1. (D.I. 609, ex. 3 at ¶¶ 1109–10) For the same reasons as above, as it relates to the preamble of claim 1 of the '932 patent, Weinstein does not incorporate Weinstein-82 by reference. Therefore, the combination of Weinstein and Weinstein-82 does not anticipate claim 1 of the '932 patent.

### iii. Third limitation, claim 1 of the '052 patent

The third limitation of claim 1 of the '052 patent recites "in the processing system, processing the signaling to select a network code that identifies a network element to provide egress for the user communication from the packet communication system[.]" ('052 patent, 22:16–19) At claim construction, the parties agreed that "process[ing] . . . to select" means "process[ing] . . . to participate in the selecting[.]" (D.I. 490 at 2; D.I. 400 at ¶ 19) The Court construed "a network code that identifies a network element to provide egress . . . from the packet communication system[]" to mean "[a] code identifying a network element that provides an exit from the packet communication system." (D.I. 541 at ¶ 4)

Bradner opined that page 121 of Weinstein-82, together with Weinstein and Heggestad-83 (which is discussed below), anticipate this third limitation. (D.I. 635, ex. 2 at ¶ 1153) He explained that, in Weinstein, "[t]he RCP processed the called number to determine the proper

destination and used Common Channel Signaling (CCS) to determine a path to the destination (the network element that provides an egress from the packet communication system). The path was represented as a ST connection ID (the network code)." (*Id.*) However, Weinstein does not discuss an "ST connection ID[,]" and Bradner relied on Heggestad-83 to introduce "the NVP and ST protocols . . .[which are used] to establish and maintain the call[]" in combination with a more detailed description in Weinstein-82 to build his case for anticipation. (*Id.*) The relevant text from Weinstein-82 is as follows:

> The format for an aggregated stream (ST) packet, as would be delivered by a concentrator to a PSAT to be transmitted in a stream slot allocated within the PODA frame, is illustrated in Fig. 7. The sample packet includes voice for two point-to-point (PTP) calls and one conference (CONF) call. All headers are grouped at the start of the packet. This allows advantage to be taken of the flexible coding properties of the burst modem (see Section III), by coding the headers (where bit errors are extremely damaging) more heavily than the speech (where some bit errors can be tolerated). The individual PTP headers are quite short, since they need contain only a connection identification (CID) and not the full destination address.

(*Id.*) As Bradner explained, this text details how the ST protocol works. (*Id.*)

Unfortunately, Weinstein does not discuss the ST protocol in the first place, and when it cites to Weinstein-82 it is under the guise that Weinstein-82 is one of three documents that describes that "DARPA's primary experimental objectives are development and demonstration of techniques for efficient multiplexing of packet voice and data traffic [3, 4, 5] in an internetwork environment including wideband shared satellite links." (D.I. 609, ex. 1 at 449) The cited text in the target document does not mention "DARPA[,]" "experimental objectives[,]" or "techniques for efficient multiplexing of packet voice and data traffic[,]" and Bradner provided no explanation as to why a person of ordinary skill in the art would read the relevant passage in Weinstein (the host document), understand that it references Weinstein-82 (the target document), and specifically that it references the above passage from Weinstein-82 discussing the ST protocol. (D.I. 635, ex. 2 at ¶ 1153) Therefore, the Court cannot conclude with "detailed

particularity" that the above (ST protocol) passage identified by Bradner, is the "specific material" that the host document (Weinstein) identifies that it incorporates by reference. *Advanced Display Systems*, 212 F.3d at 1282. Cox has not demonstrated that, for purposes of the third limitation of claim 1 of the '052 patent, Weinstein incorporates Weinstein-82 by reference. For these reasons, the combination of Weinstein, Heggestad-83, and Weinstein-82 does not anticipate claim 1 of the '052 patent.

### iv. Fifth limitation, claim 1 of the '052 patent

As with the third limitation of claim 1, Bradner relied on the same ST-protocol passage on page 121 of Weinstein-82 as anticipating the fifth limitation of claim 1. (D.I. 635, ex. 2 at ¶ 1363) For the same reasons as above, Cox has not demonstrated that, with respect to the fifth limitation of claim 1 of the '052 patent, Weinstein incorporates Weinstein-82 by reference. Therefore, the combination of Weinstein and Weinstein-82 does not anticipate claim 1 of the '052 patent.

### v. Conclusion: Weinstein-82

For the reasons discussed above, the combination of Weinstein and Weinstein-82 does not anticipate claim 1 of the '052 patent, and claim 1 of the '932 patent. Also, the combination of Weinstein, Heggestad-83, and Weinstein-82 does not anticipate claim 1 of the '052 patent. *See Commonwealth Scientific*, 542 F.3d at 1372; *Advanced Display Systems*, 212 F.3d at 1282.

### b. Reference [4]: Heggestad-83

Weinstein identifies Reference 4 as "H.M. Heggestad and C.J. Weinstein, 'Voice and Data Communication Experiments on a Wideband Satellite/Terrestrial Inter network System,' ICC '83 Conference Record, pp. l-8." (D.I. 609, ex. 1 at 455) The citation indicates that the referenced material is found on pages 1–8. (*Id.*) Bradner identified this publication as "[Heggestad-83]" ("Heggestad-83") in his report. (D.I. 583, ex. 3 at ¶ 1102)

### i. Third limitation, claim 1 of the '052 patent

As discussed above in relation to Weinstein-82, Bradner opined that Weinstein incorporates Heggestad-83 and Weinstein-82 by reference to describe (in detail) the ST protocol and to anticipate the third limitation of claim 1 of the '052 patent. (D.I. 635, ex.2 at ¶ 1153) Weinstein cites to Heggestad-83 in the same fashion as Weinstein-82 and as discussed above. (D.I. 609, ex.1 at 449) Heggestad-83 is called out separately as describing how "[i]nitial EISN experiments [4] have . . . [been used] to validate techniques for integration of satellite and terrestrial systems for alternate satellite/terrestrial routing and for call preemption." (D.I. 609, ex. 1 at 449) Elsewhere, Weinstein discusses how these:

> EISN experiments are also being directed [4] at the development of data communication techniques for eventual application in the DSN, as well as in the Defense Data Network (DDN) currently being developed to provide packet-switched data communications for the DoD, and in the integrated voice/data system represented by the World Wide Digital System Architecture (WWDSA) [2] being planned by DCA.

(D.I. 609, ex. 1 at 450 (Weinstein)) And in Section III:

> This section outlines the satellite/terrestrial integration and routing experiments which have been conducted using the EISN equipment shown Fig. 1 and in the top portion of Fig. 2. The results of these experiments [4] include the validation and demonstration of capabilities for: (1) utilization of the packet switched WB SATNET for trunking between local circuit switches; (2) mechanisms for alternate long-haul satellite or terrestrial routing (e.g., a DSN-like utilization of a mix of transmission media); (3) dial-up access between EISN and standard phones on local PBXs; (4) preemption of calls on satellite or terrestrial trunks, controlled by CCS messages transported in datagram format over WB SATNET; and (5) end-to-end interoperability between circuit-oriented telephones on EISN and packet voice terminals on local area packet nets.

(D.I. 609, ex. 1 at 452 (Weinstein)) These passages identify Heggestad-83 as describing a set of experiments, on this packet network (EISN).

Meanwhile, the target passage on page 5 of Heggestad-83 explains that:

The basic satellite trunking capability for two simultaneous, independent calls between 4-wire phones at the two sites was first achieved in February 1982. The calling party at one site keyed a three-digit "area code" designating the other site, followed by the seven-digit number of one of the telephones there. The PCI and gateway at the originating site transformed this information into IP datagram form identical to that used for call setup in the packet voice environment described earlier, and the two PCIs used the NVP and ST protocols as before to establish and maintain the call. Voice quality on the calls was excellent, as expected for end-to-end 64 kbps PCM.

(D.I. 635, ex. 2 at ¶ 1153 (Heggestad-83)) None of the passages in the host document discusses the experiments in detail or the underlying technologies such as the ST or NVP protocols, which are found in Heggestad-83. (*Id.*) In its brief, Cox points to conclusory statements in Bradner's report. (D.I. 635 at 7) For example, as it relates to Heggestad-83, Bradner provided no explanation as to why a person of ordinary skill in the art would read the above passages in Weinstein (the host document) as describing the ST or NVP protocols. (D.I. 635, ex. 2 at ¶ 1153) Even if one were to understand one of the three references to Reference #4 (Heggestad-83) in Weinstein as discussing the ST and NVP protocols, Bradner did not explain how a person of ordinary skill would further understand that the specific reference to these protocols on page 5 of Heggestad-83 (the target document) is what the author of Weinstein intended when he cited to pages 1–8 of Heggestad-83.

### ii. Conclusion: Heggestad-83

For these above reasons, as it relates to the third limitation of claim 1 of the '052 patent, Cox has not demonstrated that Weinstein incorporates Heggestad-83 by reference. Correspondingly, Weinstein, in conjunction with Weinstein-82 and Heggestad-83 do not anticipate claim 1 of the '052 patent.

### c. Reference [5]: Weinstein-Forgie

Weinstein identifies Reference 5 as "C.J. Weinstein and J.W. Forgie, 'Experience with Speech Communication in Packet []Networks,' IEEE Transactions on Communication, to appear

in December 1983 Special Issue on Packet-Switched Voice and Data Communications."
(D.I. 609, ex. 1 at 455)  This is the "Weinstein-Forgie paper[,]" which Bradner identified
separately as "[Weinstein-83b]" but does not allege to be part of the "Weinstein prior art[.]"
(D.I. 583, ex. 3 at ¶¶ 1102, 1293)  Bradner attempted to incorporate Weinstein-Forgie by
reference into his anticipation analysis involving Weinstein.  (D.I. 635, ex. 2 at ¶ 1166)  The
citation in Weinstein (the host document) does not indicate where the referenced material is
found in Weinstein-Forgie (the target document).  (D.I. 609, ex. 1 at 455)

### i. Claim 3 of the '052 patent

Claim 3 of the '052 patent depends on independent claim 1.  Claim 3 recites "[t]he
method of claim 1 wherein receiving the user communication comprises receiving the user
communication from a DS0 connection."  ('052 patent, 22:26–29)  The Court construed the
"DS0 connection" to mean "[a] channel over which DS0 Communication Signals (a term of art
meaning Digital Signal Level 0) are transmitted or received."  (D.I. 400 at ¶ 30)

Bradner opined that claim 3 is anticipated by a combination of references, including
Weinstein-Forgie.  Bradner explained that "[t]he Weinstein prior art describes receiving the user
communication (voice) via T-1 circuit[.]"  (D.I. 635, ex. 2 at ¶ 1166)  In support, Bradner
provided the following diagram from Figure 12 of Weinstein-Forgie:



Fig. 12.   Wide-band packet speech experiment status—September 1982.

[Weinstein-83b] Figure 12 with a T1 highlighted.

(*Id.* (highlighting in Bradner's report))  Again, Bradner did not explain why a person of ordinary skill in the art would read Weinstein (the host document) as incorporating by reference Weinstein-Forgie (the target document) based solely on a statement that "DARPA's primary experimental objectives are development and demonstration of techniques for efficient multiplexing of packet voice and data traffic [3, 4, 5] in an internetwork environment including wideband shared satellite links."  (D.I. 609, ex. 1 at 449)  Moreover, Bradner did not explain how a person of ordinary skill would understand a citation to the entire Weinstein-Forgie paper as referring specifically to a T-1 line identified in Figure 12 of the paper.  (D.I. 635, ex. 2 at ¶ 1166)

### ii.  Conclusion: Weinstein-Forgie

As it relates to claim 3 of the '052 patent, Cox has not demonstrated that Weinstein incorporates by reference Weinstein-Forgie.  Therefore, the combination of the Weinstein and Weinstein-Forgie papers does not anticipate claim 3 of the '052 patent.

### 3.  Conclusion: Weinstein references

For the reasons discussed above:  (1) the combination of Weinstein with LL-NSSTP-AR-80 does not anticipate any asserted claim of the Call Control patents; (2) the combination of Weinstein with AR-83 does not anticipate claim 1 of the '052 patent; (3) the combination of

23

Weinstein with Weinstein-82 does not anticipate claim 1 of the '052 patent; (4) the combination of Weinstein with Weinstein-82 does not anticipate claim 1 of the '932 patent; (5) the combination of Weinstein with Weinstein-82 and Heggestad-83 does not anticipate claim 1 of the '052 patent; and (6) the combination of the Weinstein and Weinstein-Forgie papers does not anticipate claim 3 of the '052 patent.  *See Commonwealth Scientific*, 542 F.3d at 1372; *Advanced Display Systems*, 212 F.3d at 1282.

### D.  Weinstein-Forgie

Bradner opined that Weinstein-Forgie incorporates by reference eight different documents.  These documents are:  (1) Reference [2] "Jacobs-78"; (2) Reference [16] "NVP-76"; (3) Reference [27] "ST-79"; (4) Reference [32] "McElwain-83"; (5) Reference [34] "Gold-77"; (6) Reference [52] "Weinstein-82" (as discussed above); (7) Reference [54] "AR-81"; and (8) Reference [57] "Merritt-83[,]" which together form the basis for the "Weinstein-Forgie prior art."  (D.I. 581, ex 3 at ¶¶ 1295–96)  Cox notes that "the Weinstein-Forgie [paper] cites to a series of references that discuss the protocols used for [] packet transmission[.]"  (D.I. 635 at 6)  Cox points to two passages from Weinstein-Forgie in which the authors cite to many of the allegedly incorporated documents:

> **Packet networks [1]-[8] using a variety of point-to-point and broadcast transmission media** have been developed for these applications, and techniques have been developed for internetwork communication [10], [11] among dissimilar nets.

> **Packet techniques offer significant benefits for voice as well as for data [15]-[33].**  The integration of digital voice with data in a common packet-switched system offers potential cost savings through sharing of switching and transmission resources [30] as well as enhanced services for users that require access to both voice and data communications [59]-[61].

(*Id.* emphasis in Cox's brief) (citing (D.I. 609, ex. 2 at 963))  As with Weinstein, Cox avers that "[w]hile [] Bradner lists documents #16 (NVP-76), #32 (McElwain-83), and #34 (Gold-77), he does not rely on those documents to satisfy any limitation of any claim[,]" and they "can simply

be dropped from the list of materials used for the Weinstein-Forgie opinion."[7] (*Id.* at 6 & n.3) After Cox has "dropped" the references that Bradner does not use in his report—only two (References [2] and [27]) are addressed by the above language.

Sprint argues that the above citations comprise footnote citations that "fail[] to incorporate 'any or all' of the document." (D.I. 621 at 5 (citing *Commonwealth Scientific*, 542 F.3d at 1372) In *Commonwealth Scientific*, the United States Court of Appeals for the Federal Circuit held that a "footnote citation . . . could provide a justification for combining [] references for obviousness purposes, but . . . the reference . . . [does not] appear[] to constitute an incorporation of any or all of the information from the [target] reference under the standard set forth in *Advanced Display Systems*." *Commonwealth Scientific*, 542 F.3d at 1372. While the case may provide support for specific instances in which a footnote citation fails to incorporate a target document by reference, Sprint does not explain why the court should deviate from the two-step inquiry in *Advanced Display Systems*.

### 1. Identified References

Cox identifies two specific instances where it alleges that Weinstein-Forgie incorporates by reference target documents—these are Reference 27, ST-79, and Reference 2, Jacobs-78.[8] (D.I. 635 at 6 (citing *Id.*, ex. 2 at ¶¶ 1354, 1363))

### a. Reference [27]: ST-79

Weinstein-Forgie identifies Reference 27 as "J.W. Forgie, 'ST—A proposed internet stream protocol,' **unpublished memorandum**." (D.I. 609, ex. 2 at 979 (emphasis added)) Sprint argues that an unpublished document cannot be prior art. (D.I. 621 at 6 n.10) Bradner provided a different reference for ST-79 in his report, simply stating that that reference is to "the published version of reference 27" without any explanation. (D.I. 583, ex. 3 at ¶ 1295) Cox did

---

[7] Therefore, summary judgment of no anticipation is appropriate with respect to these references.

[8] Cox also provides excerpts from Bradner's report relevant to its anticipation theories as they relate to these references.

not respond to Sprint's argument and did not explain its position that ST-79 is a publication for the purposes of anticipation. (D.I. 635 at 6)

Weinstein-Forgie (the host document) identifies Reference 27 (ST-79) as an "unpublished memorandum" authored by James Forgie ("Forgie") who is also a co-author of Weinstein-Forgie. Given that Forgie was in a position to know (in 1983, when Weinstein-Forgie was written) whether ST-79 (which he had authored some four years prior) had been published at the time, the reference in Weinstein-Forgie is credible. In the case at bar, Cox has not demonstrated that ST-79 was published or available at the time Weinstein-Forgie was published. *Cf. Quaker City Gear Works, Inc. v. Skil Corp.*, 747 F.2d 1446, 1455 (Fed. Cir. 1984).

### i. Third limitation, claim 1 of the '052 patent

Moreover, even if (as Bradner suggested) ST-79 was published at some point in time, the reference to ST-79 in Weinstein-Forgie is legally insufficient for two reasons. First, Reference 27 (ST-79) is included in a general set of citations in Weinstein-Forgie (the host document) that "[p]acket techniques offer significant benefits for voice as well as for data [15]–[33]." (D.I. 609, ex. 2 at 963) With respect to the third limitation of claim 1 of the '052 patent, Bradner identified a section from pages 10–11 of the ST-79 paper (the target document) that discusses the ST protocol in detail. (D.I. 635, ex. 2 at ¶ 1354) The cited target reference does not appear to relate to how "packet techniques" offer "benefits for voice as well as for data[,]" and Bradner did not explain. In the case at bar, Cox has not demonstrated how the host document "identifies with detailed particularity" that this general statement about "packet techniques" specifically identifies the ST protocol passage in ST-79. Second, as a general citation to an "unpublished memorandum" the reference does not "clearly indicate where [the referenced] material [can be] found in [ST-79]." *Advanced Display Systems*, 212 F.3d at 1282.

### ii. Conclusion: ST-79

For the above reasons, Cox has not demonstrated that ST-79 is a publication for the purposes of anticipation of any asserted claims of the asserted patents. And, as it relates to the

third limitation of claim 1 of the '052 patent, Cox has failed to demonstrate that the Weinstein-Forgie incorporates ST-79 by reference. Therefore, the combination of Weinstein-Forgie and ST-79 does not anticipate claim 1 of the '052 patent.

### b. Reference [2]: Jacobs-78

Weinstein-Forgie identifies Reference 2 as "I.M. Jacobs, R.Binder, and E.Hoversten, 'General purpose packet satellite networks,' Proc. IEEE, vol. 66, pp. 1448–67, Nov. 1978." (D.I. 609, ex. 2 at 979) Bradner described Reference 2 as "[Jacobs-78]" ("Jacobs-78"). (D.I. 583, ex. 3 at ¶ 1295) The citation to Jacobs-78 in Weinstein-Forgie is to the entire 20-page article. (D.I. 609, ex. 2 at 979)

Jacobs-78 is cited in two places in Weinstein-Forgie. The first is as part of a general citation to a number of publications describing packet data networking

> The primary application of packet techniques has been for digital data communications where the bursty nature of user traffic can be exploited to achieve large efficiency advantages in utilization of communication resources. Packet networks [1]–[8] using a variety of point-to-point and broadcast transmission media have been developed for these applications, and techniques have been developed for internetwork communication [10], [11] among dissimilar nets.

(D.I. 609, ex. 2 at 963) In this context, Reference 2 (Jacobs-78) is identified as a publication that describes how "[p]acket networks [are] using a variety of point-to-point and broadcast transmission media" to apply "packet techniques . . . [to] digital data communications." (*Id.*) The second reference to Jacobs-78 involves a discussion of the "SATNET" network:

> The Atlantic packet satellite network (SATNET) [4] is a packet-switched network that utilizes a distributed-control demand-assignment multiple-access (DAMA) algorithm called priority-oriented demand assignment (PODA) [2] to share a 64 kbit/s INTELSAT channel among earth stations in the United States and Europe.

(*Id.* at 972)  In this context, Weinstein-Forgie appears to reference Jacobs-78 as explaining more about the PODA algorithm.

### i. Fifth limitation, claim 1 of the '052 patent

Cox contends that paragraph 1363 in Bradner's report provides support for incorporation by reference of Jacobs-78 into Weinstein-Forgie.  (D.I. 635 at 6)  This is a reference to a section discussing Bradner's anticipation opinion with respect to the fifth limitation of the '052 patent, which recites "transferring a packet including the network code and the user communication from the device to the packet communication system in response to the instruction."  ('052 patent, 22:22–24)

In his report, Bradner explained that "[t]he user communication in the Weinstein-Forgie prior art was transported over [the] ST [protocol].  ST [protocol] packets included a connection ID (the network code)[.]"  (D.I. 635, ex. 2 at ¶ 1363)  Bradner opined that the fifth limitation of claim 1 of the '052 patent is anticipated by Weinstein-Forgie, which allegedly incorporates by reference Jacobs-78 and Weinstein-82 (Reference 52 in Weinstein-Forgie and discussed above as Reference 3 with respect to Weinstein).  (*Id.*)  Bradner identified passages from these two publications, which when taken together, form the basis for his invalidity theory.  Bradner also identified the following passage as, within the context of the fifth limitation of claim 1 of the '052 patent, the target reference identified by Weinstein-Forgie:

> The global scheduling mechanism can be used to achieve efficient message acknowledgment transmissions for high reliability traffic. All scheduling stations note the destination address in each message header sent in the information subframe.  If the destination station has a pending reservation which will allow transmission of the acknowledgment within the latter's time constraint, the reservation is expanded to allow time for the acknowledgment.  If no reservations are pending, a reservation is created and entered into the scheduling queue to allow the acknowledgment to be sent in a separate burst.  Each message header is check-summed separately from the rest of the message, maintaining the low reservation error rate required for global scheduling synchronization.

28

(D.I. 635, ex. 2 at ¶ 1363 (Jacobs-78))  This passage appears to relate to a network in some capacity, but it does not specifically mention the ST protocol on which Bradner appears to base his opinion.  Bradner did not explain which of the two citations in Weinstein-Forgie refer to this passage.  (*Id.*)  The first citation is general and does not appear to correlate to the target passage.  The second citation, identifying the PODA algorithm, may relate to the target passage, but Bradner did not fill in the gaps or explain the context for the above passage.  (*Id.*)  For these reasons, as it relates to the fifth limitation of claim 1 of the '052 patent, Cox has failed to demonstrate that Weinstein-Forgie incorporates Jacobs-78 by reference.  Therefore, the combination of Weinstein-Forgie and Jacobs-78 does not anticipate claim 1 of the '052 patent.

### ii.  Conclusion: Jacobs-78

As it relates to the fifth limitation of claim 1 of the '052 patent, for the above reasons, Cox has not demonstrated that the Weinstein-Forgie incorporates Jacobs-78 by reference.  Therefore, the combination of Weinstein-Forgie and Jacobs-78 does not anticipate claim 1 of the '052 patent.

### c.  Reference [52]: Weinstein-82

Reference 52 is identified as the Weinstein-82 paper mentioned above, and Weinstein-Forgie cites to the entire Weinstein-82 document.  (D.I. 609, ex. 2 at 980; D.I. 583, ex. 3 at ¶ 1295)  Cox identifies Bradner's report at paragraph 1363 as demonstrating how Weinstein-Forgie incorporates other documents by reference.  (D.I. 635 at 6)  This paragraph relies on two references:  Jacobs-78 (discussed above) and Weinstein-82.  Weinstein-Forgie explains that Weinstein-82 describes "[a]n experimental wide-band satellite-based packet system [52], [53] [,which] has been implemented to develop and demonstrate techniques for integrating packet voice with data in a realistic large scale network.  The system is designed around a satellite channel with a capacity of 3.088 Mbits/s, in order to support many simultaneous voice connections."  (D.I. 609, ex. 2 at 973)

### i. Fifth limitation, claim 1 of the '052 patent

The fifth limitation of the '052 patent recites "transferring a packet including the network code and the user communication from the device to the packet communication system in response to the instruction." ('052 patent, 22:22–24) As above, Bradner explained that "[t]he user communication in the Weinstein-Forgie prior art was transported over [the] ST [protocol]. ST [protocol] packets included a connection ID (the network code)[.]" (D.I. 635, ex. 2 at ¶ 1363)

Bradner identified two separate passages on pages 116 and 121 of Weinstein-82 that he believed anticipated the fifth limitation of claim 1 of the '052 patent:

> The format for an aggregated stream (ST) packet, as would be delivered by a concentrator to a PSAT to be transmitted in a stream slot allocated within the PODA frame, is illustrated in Fig. 7. The sample packet includes voice for two point-to-point (PTP) calls and one conference (CONF) call. All headers are grouped at the start of the packet. This allows advantage to be taken of the flexible coding properties of the burst modem (see Section III), by coding the headers (where bit errors are extremely damaging) more heavily than the speech (where some bit errors can be tolerated). The individual PTP headers are quite short, since they need contain only a connection identification (CID) and not the full destination address. [Weinstein-82] page 121.
>
> . . . .
>
> Access from the local area onto the WB SATNET is obtained by means of an internetwork gateway at each site, as shown in Fig. 1. The gateways carry out a number of tasks including (1) communication with the WB SATNET nodes; (2) inserting the specific WB SATNET headers needed to transport long distance packets to the destination gateway; (3) concentrating speech packets from a number of local terminals into aggregated packets for the satellite net; and (4) requesting satellite capacity allocation on the WB SATNET based on rate requirements identified by packet voice terminals at dial-up. [Weinstein-82] page 116

(*Id.*) Bradner also included Figure 1 from Weinstein-82 in his opinion. (*Id.*)

However, Bradner provided no explanation for how a person of ordinary skill in the art would read a citation to a document describing "[a]n experimental wide-band satellite-based

packet system . . . with a capacity of 3.088 Mbits/s, in order to support many simultaneous voice connections[]" as identifying with "detailed particularity" a passage about the ST protocol (page 121) and the architecture of WB-SATNET (page 116). *Advanced Display Systems*, 212 F.3d at 1282. Nor did Bradner explain how a person of ordinary skill in the art would read the citation in Weinstein-Forgie as "clearly indicat[ing]" that the referenced material would be found on those pages in Weinstein-82. *Id.*

### ii. Conclusion: Weinstein-82

As it relates to the fifth limitation of claim 1 of the '052 patent, for the above reasons, Cox has not demonstrated that the Weinstein-Forgie incorporates Weinstein-82 by reference. Therefore, the combination of Weinstein-Forgie and Weinstein-82 does not anticipate claim 1 of the '052 patent.

### 2. Conclusion: Weinstein-Forgie paper references

For the reasons discussed above: (1) the combinations of NVP-76, McElwain-83, and Gold-77 with Weinstein-Forgie do not anticipate any asserted claims of the Call Control patents; (2) the combination of Weinstein-Forgie with ST-79 does not anticipate any asserted claims of the Call Control patents; (3) the combination of Weinstein-Forgie with ST-79 does not anticipate claim 1 of the '052 patent; (4) the combination of Weinstein-Forgie with Jacobs-78 does not anticipate claim 1 of the '052 patent; (5) the combination of Weinstein-Forgie with Heggestad-83 does not anticipate claim 1 of the '052 patent; (6) the combination of Weinstein-Forgie with Weinstein-82 does not anticipate claim 1 of the '052 patent; and (7) the combination of Weinstein-Forgie with Weinstein-82 and Heggestad-83 does not anticipate claim 1 of the '052 patent. *See Commonwealth Scientific*, 542 F.3d at 1372; *Advanced Display Systems*, 212 F.3d at 1282.

**E. Obviousness**

Sprint moves for partial summary judgment of no obviousness as to the Call Control patents. (D.I. 582) At his deposition, Bradner confirmed that he did not perform an analysis of whether the "Weinstein prior art" and the "Weinstein-Forgie prior art" render any asserted claims of the Call Control patents obvious. (D.I. 583, ex. 4 at 134:2–9) Accordingly, Sprint argues that summary judgment as to obviousness is appropriate. (D.I. 583 at 11) Cox did not respond to this argument in either of its briefs. (D.I. 609; D.I. 635) For these reasons, the Court grants Sprint's motion. *Cf. Wahpeton Canvas Co. v. Bremer*, 958 F. Supp. 1347, 1358 (N.D. Iowa 1997).

## IV. CONCLUSION

For the foregoing reasons, the Court grants-in-part and denies-in-part Sprint's motion. (D.I. 582)

An appropriate order shall issue.