# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SPRINT COMMUNICATIONS COMPANY L.P., et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civ. No. 12-487-JFB |
| COX COMMUNICATIONS INC., et al., | ) ) | |
| Defendants. | ) | |

Richard K. Herrmann, Esquire, and Mary Matterer, Morris James LLP, Wilmington, Delaware. Counsel for Plaintiffs. Of Counsel: Jordan T. Bergsten, Esquire, Ryan D. Dykal, Esquire, Aaron E Hankel, Esquire, Robert H. Reckers, Esquire, Ryan J Schletzbaum, Esquire, and Basil Trent Webb, Esquire of Shook, Hardy & Bacon LLP.

David A. Bilson, Esquire, and John C. Phillips, Jr., Phillips, Goldman, McLaughlin & Hall, P.A., Wilmington, Delaware. Counsel for Defendants. Of Counsel: David S. Bloch, Esquire, Michael L. Brody, Esquire, Krishnan Padmanabhan, Esquire, Pejman F. Sharifi, Esquire, and James Winn, Esquire of Winston & Strawn LLP.

# MEMORANDUM OPINION

November 9, 2017
Wilmington, Delaware

**BATAILLON, Senior District Judge**

# I. INTRODUCTION

In this patent case involving Plaintiff Sprint Communications Company, L.P. ("Plaintiff" or "Sprint") against Defendant Cox Communications, Inc. ("Defendant" or "Cox"), Sprint alleges that Cox infringes certain of Sprint's telecommunications and data networking patents.[1] Among these patents are U.S. Patent Nos. 7,286,561 ("the '6,561 patent"), 6,633,561 ("the '3,561 patent"), 6,463,052 ("the '052 patent"), and 6,452,932 ("the '932 patent") (collectively the "Call Control Patents") and U.S. Patent Nos. 6,473,429 ("the '429 patent"), 6,343,084 ("the '084 patent"), and 6,298,064 ("the '064 patent") (collectively the "Broadband Patents"). Sprint asserts approximately 15 claims from the Call Control Patents and the Broadband Patents (the "patents-in-suit") against Cox. (D.I. 650 at 2) District Judge Sue L. Robinson construed various claim terms of the patents-in-suit in March 2016 and May 2017. (D.I. 399; D.I. 400, D.I. 541) Upon Judge Robinson's retirement from the bench, the case was reassigned to the undersigned on June 16, 2017. (D.I. 557) A pre-trial conference is scheduled for November 17, 2017, with a jury trial set to begin on December 7, 2017. (D.I. 603; D.I. 654) The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

As part of its defenses to the allegation of patent infringement by Sprint, Cox contends that the patents-in-suit are invalid for lack of written description under 35 U.S.C. § 112, ¶ 1.[2] (D.I. 608 at 1) In support, Cox presents the testimony of its expert witnesses Paul S. Min, PhD ("Dr. Min") and Kevin Almeroth, PhD ("Dr. Almeroth"). (*See, e.g.*, D.I. 587, ex. 1 at ¶ 105) Based upon this testimony, and Cox's admissions, Sprint argues that "the claims as construed are supported by the specification[,]" (D.I. 587 at 15), and has moved for partial summary judgment

---

[1] The parties and procedural background for this matter have been documented extensively elsewhere. (D.I. 399 at ¶¶ 1–3 & nn. 1–5; D.I. 541 at ¶¶ 1–3) Upon Sprint's motion, (D.I. 641), the court realigned the parties, (D.I. 662).

[2] Cox cites to 35 U.S.C. § 112(a), which is the post-AIA version of the statute. (D.I. 608 at 7) The patents-in-suit claim priority to the '605 application, which was filed on May 5, 1994. The Broadband Patents are continuations of the '897 application, which is a continuation-in-part of the '605 application, and which are filed on September 8, 1995. These dates place all the patents-in-suit well in advance of the AIA. Therefore, the court applies the pre-AIA version of the statute.

of no invalidity of the patents-in-suit, (D.I. 586). Sprint has also moved to exclude the testimony of Drs. Min and Almeroth. (*Id.*)

Meanwhile, Sprint has presented the validity opinions of its expert, Dr. Stephen Wicker ("Dr. Wicker"). (D.I. 620, exs. 2, 3, 4) Based upon Dr. Wicker's reports, Cox contends that "there are no genuine factual disputes" as to its central theory that all of "Sprint's patents[3] disclose only *connection-oriented* technology, namely [Asynchronous Transfer Mode] ATM, for packet-voice transmissions[]" and cannot, therefore, read on products and services that employ Internet Protocol (IP) technologies. (D.I. 608 at 1 (emphasis in original)) As a result, Cox has moved for partial summary judgment of invalidity of the patents-in-suit. (*Id.*)

During briefing on the instant motion, in its reply brief, Sprint included an Appendix A, entitled "Sprint's Response to Cox's Statement of Facts (CSUF)[,]" which is a nine-page response to the statement of facts that Cox presented in its answering brief. (D.I. 620, appx. A; D.I. 608 at ¶¶ 1–7) Cox moved to strike this material, arguing that it "contain[s] additional pages of substantive arguments." (D.I. 634 at 1)

## II. BACKGROUND

### A. The Patents

The patents-in-suit relate to transmission of telephone calls between traditional telephone networks and packet data networks. All of the patents-in-suit originate from U.S. Patent Application No. 08/238,605 ("the '605 application"), which was filed on May 5, 1994 and was abandoned by applicant. (*See, e.g.*, '052 patent, 1:5–10) The '605 application is incorporated by reference into all of the patents-in-suit. (*Id.*) The Call Control Patents are continuations of the '605 application and share a common specification. (*Id.*; '932 patent, 1:5–12; '3,561 patent, 1:5–12; '6,561 patent, 1:6–12) The Broadband Patents share a common specification and are

---

[3] Cox appears to argue that all asserted "patents" are invalid for lack of written description, without explaining differences between the Broadband Patents (for which two claim limitations were construed to be limited to ATM technology) and the Call Control Patents (for which no claim limitations were construed to be limited to ATM technology). (D.I. 608; D.I. 633) Moreover, as to the written description, Drs. Min and Almeroth did not identify which claim limitations are involved.

continuations of U.S. Patent Application No. 08/525,897 ("the '897 application"), filed on September 8, 1995, which is now U.S. Patent No. 5,991,301. ('429 patent, front page, item [63][4], 1:6–16; '084 patent, front page, item [63][5]; '064 patent, front page, item [63][6])

In the written description analysis, the relationship between the Call Control and Broadband Patents is important.[7] Elsewhere in the summary judgment briefing, Cox argues that the [Broadband Patents] explicitly disclaim any relationship to the [Call Control Patents.]" (D.I. 627 at 14)

The '897 application initially claimed to be a continuation-in-part of the '605 application. ('301 patent, front page, item [63]; 1:6–10) By definition, a continuation-in-part application is "filed during the lifetime of an earlier [] application, [and] repeat[s] some substantial portion or all of the earlier [] application and add[s] matter not disclosed in the [] earlier [] application." § 201.08 MPEP (9th ed., Rev. 07.2015, Nov. 2015). The '301 patent issued on November 23, 1999. ('301 patent, front page) In December 2004, applicant requested a Certificate of Correction related to "Item [63], Related U.S. Application Data," in which the '301 patent claimed it was a "[c]ontinuation-in-part of application No. 08/238,605, May 5, 1994, abandoned." (*Id.*, Certificate of Correction)[8] A Certificate of Correction operates as follows:

> Whenever a mistake of a clerical or typographical nature, or of minor character, which was not the fault of the Patent and Trademark Office, appears in a patent and a showing has been made that such mistake occurred in good faith, the Director may, upon payment of the required fee, issue a certificate of correction, if the correction does not involve such changes in the patent as

---

[4] *See* January 27, 2004 Certificate of Correction.

[5] *See* February 22, 2005 Certificate of Correction.

[6] *See* January 18, 2005 Certificate of Correction.

[7] *See infra* Section IV.A.2.

[8] The court infers the nature of the request from the certificate itself. The USPTO "Transaction History" in PAIR shows a "Post Issue Communication – Certificate of Correction" entry dated December 10, 2004. *See* USPTO Patent Application Information Retrieval (PAIR) at https://portal.uspto.gov/pair/PublicPair. The Certificate of Correction issued on January 4, 2005. ('301 patent, Certificate of Correction) The court notes that the "Continuity Data" information in PAIR still shows that the '897 application is a continuation in part of the '605 application.

> would constitute new matter or would require re-examination.
> Such patent, together with the certificate, shall have the
> same effect and operation in law on the trial of actions for causes
> thereafter arising as if the same had been originally issued in such
> corrected form.

35 U.S.C. § 255. The USPTO has identified "[t]wo separate statutory requirements [that] must be met before a certificate of correction for an applicant's mistake may issue." *In Re Arnott*, 19 U.S.P.Q.2d 1049 at *5 (Com'r Pat. & Trademarks May 22, 1991); *see also* § 1481 MPEP (9th ed., Rev. 07.2015, Nov. 2015). "The first statutory requirement concerns the nature, i.e., type, of the mistake for which a correction is sought. . . [, which] must be: (1) of a clerical nature, (2) of a typographical nature, or (3) a mistake of minor character." *In Re Arnott*, 19 U.S.P.Q.2d 1049 at *5. "The second statutory requirement concerns the nature of the proposed correction. The correction must not involve changes which would: (1) constitute new matter or (2) require reexamination." *Id.* The file history of the '301 patent is not currently before the court, and it is unknown what statements applicant made in December 2004; however, even if as the corrected front page states, the '301 patent is not a continuation-in-part of the '605 application,[9] that does not change the specification which states that "[t]his application is a continuation-in-part of prior application Ser. No. 08/238,605, entitled 'Method, System, and Apparatus for Telecommunications Control', filed May 5, 1994, currently pending, and incorporated by reference into this application." ('301 patent, 1:6–10) In other words, while the status of the '897 application as a continuation-in-part of the '605 application may be in doubt, at a minimum, the '897 application (which forms the basis for the Broadband Patents) incorporates by reference the '605 application (which forms the basis for the Call Control Patents). Therefore, aspects of the Broadband Patents may find support in the common specification for the Call Control

---

[9] There is not enough information to determine whether this is, or is not, the case. For example, applicant did not remove the related language in the specification claiming priority to the '605 application, and the USPTO has not reflected this change. ('301 patent, 1:6–10); *see supra* note 8.

Patents,[10] but limitations to the Broadband Patents do not necessarily result in limitations to the Call Control Patents.

### 1. The Broadband Patents

In 2016, Cox moved for summary judgment of no literal infringement of the '084 patent (which is one of the Broadband Patents) as well as several other patents no longer in suit[11] on the premise that the patents are limited to ATM (asynchronous transfer mode) technologies and that Cox's accused products and services are used in IP (Internet protocol) networks. (D.I. 357 at 25). At the time, Cox explained in its reply brief that "[t]o be clear, we agree that *if* the claims are read as limited to ATM networks, they will not run afoul of the written description requirement." (D.I. 353 at 11 (emphasis in original)) Sprint did not argue to the contrary and suggested that, under a construction limited to ATM, it would assert infringement under the Doctrine of Equivalents. (D.I. 329 at 22) Judge Robinson construed, inter alia, the "interworking unit" limitation of independent claim 1 of the '084 patent to be an "ATM interworking multiplexer[,]" (D.I. 400 at ¶ 9), and granted summary judgment of no literal infringement, (D.I. 399 at ¶¶ 6–8).

As discussed above, the other two Broadband Patents (the '429 and '064 patents) share a common specification with the '084 patent, and the parties have agreed to apply the ATM technology limitation to the '429 and '064 patents. (*See, e.g.*, D.I. 490 at 2, applying definitions of "interworking unit" as "ATM interworking multiplexer" and "asynchronous communication" as "ATM communication" to limitations in the '429 and '064 patents) As a result, Sprint does not assert that Cox literally infringes any of the Broadband Patents. (*See* D.I. 593, ex. 22 at 10:8–13, 11:15–23 (deposition of Sprint's expert witness on infringement))

---

[10] For simplicity, the court refers generally to the fact that the "Broadband Patents" incorporate by reference the specification of the "Call Control Patents" when—technically—it is the '605 application that is incorporated by reference.

[11] At the time, Sprint alleged that Cox's VoIP services infringe claims 1, 4, and 7 of the '084 patent, claims 1, 4, 7, 12, 13, and 14 of U.S. Patent No. 6,330,224 ("the '224 patent"), claims 11, 14, and 17 of U.S. Patent No. 6,697,340 ("the '340 patent"), claims 11 and 12 of U.S. Patent No. 6,563,918 ("the '918 patent"), and claim 1 of U.S. Patent No. 6,262,992 ("the '992 patent"). (D.I. 329 at 21) Sprint no longer asserts the '224, '340, and '918 patents.

### 2. The Call Control Patents

When the court granted summary judgment of no literal infringement of the '084 patent, the Call Control Patents had been ruled invalid as indefinite by Judge Robinson and were on appeal to the United States Court of Appeals for the Federal Circuit. (D.I. 399 at 1 n.2) As a result, in 2016, Cox did not argue that the Call Control Patents were invalid for lack of written description. (D.I. 357 at 19–24) Cox's Drs. Min and Almeroth expressed opinions on the written description requirement as to the Call Control Patents in June 2017. (D.I. 587, exs. 1, 5) Sprint's Dr. Wicker presented rebuttal arguments, (D.I. 630, ex. 3), and all three experts were deposed about their opinions, (D.I. 587, exs. 4, 6; D.I. 608, ex. 6).

## III. STANDARD OF REVIEW

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10 (1986). A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita, 475 U.S. at 587 (internal quotation marks omitted). The court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586–87; *see also Podobnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating that the party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). Although the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," a factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## B. Written Description

The Patent Act provides in relevant part:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . . .

35 U.S.C. § 112, ¶ 1. The written description must "clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (citation and internal quotation marks omitted). "In other words, the test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id.* (citations omitted). "The level of detail required to satisfy the written description requirement depends, in large part, on the nature of the claims

and the complexity of the technology." *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1285 (Fed. Cir. 2012) (citing *Ariad*, 598 F.3d at 1351). Neither examples nor actual reduction to practice is required; "a constructive reduction to practice that in a definite way identifies the claimed invention can satisfy the written description requirement." *Id.* (citing *Ariad*, 598 F.3d at 1352).

Accused infringers must ultimately prove that the written description fails these standards by clear and convincing evidence. *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1072–73 (Fed. Cir. 2005) (citation omitted). While compliance with the written description requirement is a question of fact, it is amenable to summary judgment in cases where no reasonable fact finder could return a verdict for the nonmoving party. *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008) (citation omitted). "Thus, a moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise." *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001) "Alternatively, a moving party seeking to have a patent held not invalid at summary judgment must show that the nonmoving party, who bears the burden of proof at trial, failed to produce clear and convincing evidence on an essential element of a defense upon which a reasonable jury could invalidate the patent." *Id.*

### C. Claim Construction

Claim construction is a matter of law. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1330 (Fed. Cir. 2005) (en banc). Claim construction focuses on intrinsic evidence—the claims, specification, and prosecution history—because intrinsic evidence is "the most significant source of the legally operative meaning of disputed claim language." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Claims must be interpreted from the perspective of one of ordinary skill in the relevant art at the time of the invention. *Phillips*, 415 F.3d at 1313. In some cases, "the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background

science or the meaning of a term in the relevant art during the relevant time period." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, _ U.S. _, 135 S. Ct. 831, 841 (2015) (citation omitted).

Claim construction starts with the claims and remains centered on the words of the claims throughout. *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). In the absence of an express intent to impart different meaning to claim limitations, "the words of a claim are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13 (quoting *Vitronics*, 90 F.3d at 1582). "The ordinary meaning may be determined by reviewing various sources, such as the claims themselves, the specification, the prosecution history, dictionaries, and any other relevant evidence. Ultimately, the only meaning that matters in claim construction is the meaning in the context of the patent." *Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*, 824 F.3d. 999, 1002–03 (Fed. Cir. 2016) (citations, internal quotation marks, and brackets omitted). The specification is often "the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315.

### D. Excluding Expert Testimony

In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993), the Supreme Court explained that Federal Rule of Evidence 702 creates "a gatekeeping role for the [trial] judge" in order to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." The rule requires that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Expert testimony is admissible only if "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d). There are three distinct requirements for admissible expert testimony: (1) the expert must be qualified; (2) the opinion must be reliable; and (3) the expert's opinion must relate to the facts. *See generally Elcock v. Kmart Corp.*, 233 F.3d 734, 741–46 (3d Cir. 2000).

## IV. DISCUSSION

### A. Written Description

Sprint has moved for summary judgment of no invalidity, (D.I. 586), and Cox has moved for summary judgment of invalidity, (D.I. 608 at 1). Therefore, Cox "must submit such clear and convincing evidence of [lack of written description] so that no reasonable jury could find otherwise." *Eli Lilly & Co.*, 251 F.3d at 962. And Sprint "must show that [Cox], who bears the burden of proof at trial, failed to produce clear and convincing evidence . . . [of lack of written description] upon which a reasonable jury could invalidate the patent." *Id.*

#### 1. Broadband Patents

As discussed above, Sprint's infringement allegations with respect to the Broadband Patents are limited to the doctrine of equivalents.[12] (D.I. 593, ex. 22 at 10:8–13, 11:15–23) According to Sprint, Cox has already made its written description arguments as to the Broadband Patents, the court has construed the relevant claim terms and has ruled in Cox's favor, and the issue is now moot. (D.I. 587 at 12) Moreover, Sprint avers that Cox's arguments are contrary to the court's claim construction, and the written description defense is foreclosed as a matter of law by the doctrine of equivalents. (*Id.* at 13–15)

Cox responds that, after "applying the [c]ourt's construction to the claims, Cox's experts have opined that a person of ordinary skill would not have understood the Sprint inventor to have possessed an 'IP' invention, because 'ATM' and 'IP' were separated by a technical chasm." (D.I. 608 at 1) Cox ignores Sprint's equivalents assertions and adheres to its written description argument, because "by accusing IP systems, Sprint insists that the claims are broader in scope than the ATM-limited disclosure. . . . [, which] bring[s] the issues of written description front and center." (*Id.* at 8) Based upon Cox's briefs, the court identifies three major areas of Cox's argument: (1) extrinsic evidence, (2) claim construction, and (3) legal principles.

---

[12] The parties do not explain whether Sprint asserts that Cox infringes the Call Control Patents under the doctrine of equivalents. To the extent that Sprint alleges infringement of the Call Control Patents under the doctrine of equivalents and Cox asserts this same invalidity argument, the court's reasoning of this Section applies.

### a. Extrinsic evidence

According to Cox, the doctrine of equivalents is simply not a factor in its written description argument, and "Drs. Min and Almeroth do not . . . . address the doctrine of equivalents at all." (D.I. 608 at 10) Without an opinion on the doctrine of equivalents, Cox has no evidence to present to a jury. Moreover, the opinions are based entirely on equivalence between the claimed subject matter (ATM-limited claim limitations) and accused products and services (that rely on IP) at the time of invention. (*See, e.g.*, D.I. 587, ex. 1 at ¶ 144 ("a person of ordinary skill in the art at the time of filing of the Asserted Patents (or underlying applications), would see the claimed system as using ATM.")) "[T]he proper time for evaluating equivalency—and thus knowledge of interchangeability between elements—is at the time of infringement, not at the time the patent was issued." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 37 (1997). Therefore, Cox does not offer any evidence upon which a reasonable jury could invalidate the Broadband Patents for lack of written description. Moreover, to the extent that Cox's arguments relate to the Call Control Patents as asserted under the doctrine of equivalents,[13] no reasonable jury could invalidate these patents for lack of written description.

### b. Claim Construction

In numerous instances, Cox appears to re-argue claim construction as to the limitations of the '084 patent that, based upon the argument and extrinsic evidence presented by Cox at the time, the court determined to be limited to ATM technology. Because, Cox does not explain why it seeks reconsideration or additional claim construction, the court addresses two areas of Cox's arguments: broadening the claim construction, and making the claim construction contingent on Sprint's infringement theories.

---

[13] As discussed below, in Section IV.A.1.c, patent validity is not, as Cox argues, a function of the theory of infringement. However, for the sake of completeness the court addresses the remainder of Cox's argument.

### (i) Broaden the construction

First, Cox appears to re-argue its contention that certain claim limitations of the Broadband Patents are limited to ATM technology (an argument that Cox has already won) but—in so doing—Cox appears to attempt to broaden the court's claim construction by restating it in numerous ways. (*Compare* D.I. 400 at ¶ 9 (construing an "interworking unit" in claim 1 of the '084 patent to mean an "ATM interworking multiplexer" and explaining why "[t]he court concludes that this limitation should be limited to ATM technology.") *and id.* at ¶ 13 (construing an "asynchronous communication" to mean an "ATM communication") *with* D.I. 633 at 5 ("The Court has found Sprint's invention [in the Broadband Patents] to be ATM-limited, and the furthest coordinates of Sprint's plot therefore fall squarely within the realm of ATM."); *see also* D.I. 608 at 8 ("It is undisputed that the only packet-voice technology disclosed in the Broadband Patents is ATM."); *id.* at 9 ("There is no dispute that the Broadband Patents have been limited to ATM, [and] do not disclose [sic] ATM[.]"); *id.* at 1 (emphasis in original) ("There is no dispute Sprint's patents disclose only *connection-oriented* technology, namely ATM, for packet-voice transmissions.")[14] Despite Cox's efforts in this regard, the court declines to revisit its prior claim construction. (D.I. 400)

### (ii) Construction contingent on infringement

Second, Cox's renewed claim construction arguments appear to be contingent on Sprint's infringement contentions. (*See, e.g.*, D.I. 608 at 2 ("Cox agreed that the written description requirement would be satisfied if Sprint did not expand the scope of the claims beyond the ATM constructions issued by the [c]ourt[.]")) This is contrary to the law:

> A claim is construed in the light of the claim language, the other claims, the prior art, the prosecution history, and the specification, *not* in light of the accused device. Contrary to what [defendant]'s counsel wrote the district court, claims are not construed "to cover" or "not to cover" the accused device. That

---

[14] Despite Cox's broad statements about the disclosure and the specification, Dr. Min did not account for the fact that the Broadband Patents incorporate by reference the specification common to the Call Control Patents. (D.I. 587, ex.2)

> procedure would make infringement a matter of judicial whim.  It is only *after* the claims have been *construed without reference to the accused device* that the claims, as so construed, are applied to the accused device to determine infringement.

*SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) (en banc) (emphasis in original) (citation omitted); *see also Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1367 (Fed. Cir. 2008) ("The district court erred . . . by construing the claim merely to exclude the accused device[.]"), *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1327 (Fed. Cir. 2006) ("While a trial court should certainly not prejudge the ultimate infringement analysis by construing claims with an aim to include or exclude an accused product or process, knowledge of that product or process provides meaningful context for the first step of the infringement analysis, claim construction."), *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1580 (Fed. Cir. 1991) ("[T]he particular accused product (or process) is kept in mind, for it is efficient to focus on the construction of only the disputed elements or limitations of the claims.").  In the case at bar, based upon the written description argument presented by Cox at the time, (D.I. 357 at 1–3), the court construed the claims and then the "claims, as so construed, [were] applied to the accused device to determine infringement[,]" *SRI Int'l*, 775 F.2d at 1118.  Based upon that finding, the court granted summary judgment of no literal infringement of claim 1 of the '084 patent.  (D.I. 399 at ¶¶ 7–8)

Cox now asks for a second bite at the apple, specifically for the court to revisit its written description argument, and for the court to—this time around—determine that "the patent claims" are invalid for lack of written description.  (D.I. 608 at 9 ("Thus, if the patent claims are broad enough to cover telephony systems, such as Cox's VoIP networks, that do not use ATM networks, then the Court should grant Cox partial summary judgment of invalidity under the written description requirement[.]"))  This is precisely the type of "judicial whim" that the Federal Circuit warned against.  *SRI Int'l*, 775 F.2d at 1118.  Therefore, the court declines to revisit its prior construction.

### c. Legal principles that lead to noninfringement, not invalidity

Despite asserting that the doctrine of equivalents plays no role in its analysis, Cox cites to case law that relates to the written description requirement (in general[15] and as applied to district court appeals of patent office interference proceedings[16]) and to the doctrine of equivalents (such as prosecution history estoppel[17] and ensnarement of equivalents[18]).  This leads to an incomplete,[19] if not contradictory,[20] presentation of the case law associated with the written description requirement.  Taken together, Cox asserts facts and principles that—in conjunction with the doctrine of equivalents infringement asserted by Sprint—lead to noninfringement, not invalidity.  These two principles are ensnarement and vitiation.

### (i) Vitiation

Cox presents its claim construction argument in a section about the Broadband Patents, which are patents for which Sprint is asserting infringement under the doctrine of equivalents.[21]

---

[15] *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479–80 (Fed. Cir. 1998) (cited by Cox in D.I. 608 at 7–8, 10–11; D.I. 633 at 1, 10); see also *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1365-66 (Fed. Cir. 2012) (cited by Cox in D.I. 608 at 9).

[16] *Koninklijke Philips Electronics N.V. v. Cardiac Science Operating Co.*, 590 F.3d 1326, 1336 (Fed. Cir. 2010) (emphasis added) (cited by Cox in D.I. 633 at 2).

[17] *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002) (cited by Cox in D.I. 633 at 1, 4, 5, 10); *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 493 F.3d 1368 (Fed. Cir. 2007) (cited by Cox in D.I. 633 at 1).

[18] *Int'l Visual Corp. v. Crown Metal Mfg. Co.*, 991 F.2d 768, 772 (Fed. Cir. 1993) (cited by Cox in D.I. 608 at 8; D.I. 633 at 1, 6); see also *Wilson Sporting Goods Co. v. David Geoffrey & Associates*, 904 F.2d 677 (Fed. Cir. 1990) (cited by Cox in D.I. 633 at 4 n.2).

[19] Cox offers a quotation of the law of the written description requirement as saying that under the statute "specifications 'limit the permissible breadth of claims,' which 'may be no broader than the supporting disclosure.'" (*See* D.I. 608 at 7–8 (citing *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479–80 (Fed. Cir. 1998)); *see also* D.I. 633 at 1).  In addition to being an incorrect quotation of the case from two sentence fragments separated by a paragraph, Cox does not explain the context of these statements.  If we put these quotations together, they are as "[a]ccordingly, his original disclosure serves to **limit the permissible breadth of** his later-drafted **claims**. . . . Rather, [the cases on which plaintiff relies] make clear that claims **may be no broader than the supporting disclosure**, and therefore that a narrow disclosure will limit claim breadth."  *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d at 1479–80 (emphasis added to identify language quoted by Cox).

[20] *See infra* Section IV.A.1.c(ii).

[21] Section I.A of Cox's answering brief addresses the Broadband Patents and Section I.C addresses the Call Control Patents, but Section I.B is vague and lacking in specificity, as a result, the court cannot ascertain to which patents it relates.  (D.I. 608 at 7–11)

(D.I. 608 at 7–10)  In its answering brief, Cox appears to argue that ATM and IP technologies are wholly antithetical, namely that "the literature consistently teaches that ATM and IP were seen as worlds-apart by technologists at the time of the invention."[22]  (D.I. 608 at 8)  In its surreply brief, Cox clarifies its argument that "the written description cannot be based on **antithetical teaching**, limited to 'fundamentally different' technology."  (D.I. 633 at 4 (emphasis added) (citing extrinsic evidence at D.I. 608, ex.2 at ex. H))  In other words, Cox avers that its IP-network elements cannot be an equivalent to the ATM-limited structures in the Broadband Patents.[23]

The test of "equivalence of a proposed substitute for a missing element is ordinarily a factual inquiry reserved for the finder of fact." *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1356 (Fed. Cir. 2012).  However, it is "the role of the court . . . to ensure that the doctrine of equivalents is not permitted to overtake the statutory function of the claims in defining the scope of the patentee's exclusive rights." *Id.*  For example, the Federal Circuit "has refused to apply the doctrine [of equivalents] in [] cases where the accused device contained the antithesis of the claimed structure." *Planet Bingo, LLC v. GameTech Int'l, Inc.*, 472 F.3d 1338, 1345 (Fed. Cir. 2006).  "In such a case, application of the doctrine of equivalents would 'vitiate' a claim element." *Deere & Co.*, 703 F.3d at 1356 (citation omitted).  "'Vitiation' is . . . a legal determination that 'the evidence is such that no reasonable jury could determine two elements to be equivalent.'" *Id.* (citing *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n.8 (1997)).  However, the remedy for vitiation is a finding of noninfringement and not invalidation of the patent.[24]  *See, e.g.*, *Planet Bingo*, 472 F.3d at 1345.

---

[22] Of course, as discussed above, an evaluation of equivalents would be at the time of infringement and not the time of invention.  *Warner-Jenkinson*, 520 U.S. at 37

[23] The court construed the ATM limitations in claim 1 of the '084 patent.  (D.I. 399; D.I. 400)  The parties agreed to include these limitations in the constructions of the '429 and '064 patents  (D.I. 490)  Sprint asserts infringement of the Broadband Patents under the doctrine of equivalents.  (D.I. 593, ex. 22 at 10:8–13, 11:15–23)

[24] Perhaps this explains why Cox argues vitiation with respect to its motion for noninfringement, (*see, e.g.*, D.I. 592 at 10), but it does not so argue with respect to written description, (D.I. 608; D.I. 633).

### (ii) Ensnarement

Cox argues that the Supreme Court's decision in *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 37 (1997), "simply does not address using the doctrine of equivalents to ensnare technology antithetical to what was disclosed."[25] (D.I. 608 at 10) Meanwhile, Cox cites extensively to an ensnarement case, *International Visual Corp. v. Crown Metal Mfg. Co.*, 991 F.2d 768 (Fed. Cir. 1993), for a statement of the written description requirement. (D.I. 608 at 8; D.I. 633 at 1, 6) That case explains that:

> Hypothetical claim analysis is an optional way of evaluating whether prior art limits the application of the doctrine of equivalents. It is simply a way of expressing the well-established principle "that a patentee should not be able to obtain, under the doctrine of equivalents, coverage which he could not lawfully have obtained from the PTO by literal claims."

*International Visual*, 991 F.2d at 772 (quoting *Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*, 904 F.2d 677, 684 (Fed. Cir. 1990) (hereinafter "*Wilson Sporting Goods*")). These cases discuss the ensnarement principle in detail. "Ensnarement bars a patentee from asserting a scope of equivalency that would encompass, or 'ensnare,' the prior art." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1322 (Fed. Cir. 2009) (citation omitted)

In its brief, Sprint argues that, *Wright Medical Technology, Inc. v. Osteonics Corp.*, No. 91-10962-GAO, 1999 WL 130578, at *1 (D. Mass. Mar. 3, 1999), explains its position that the doctrine of equivalents precludes Cox's written description argument. (D.I. 587 at 15) That case included, among other things, an ensnarement dispute. *Wright Medical*, 1999 WL 130578 at *2. Cox reponds that "*Wright Medical*, is a twenty-year-old, non-binding, and never-cited decision with limited relevance." (D.I. 608 at 10) Moreover, Cox argues, "after *Wright Medical*, the Federal Circuit made clear that infringement allegations under the doctrine of equivalents cannot be used to circumvent [the] requirements of § 112." (*Id.*) (citing *Smith & Nephew, Inc. v.*

---

[25] The Court in *Warner-Jenkinson* rejected the argument "that equivalents must not only be known, but must also be actually disclosed in the patent in order for such equivalents to infringe upon the patent." *Warner-Jenkinson*, 520 U.S. at 37.

*Ethicon, Inc.*, 276 F.3d 1304, 1313 (Fed. Cir. 2001)).  But *Smith & Nephew* relates to a different principle limiting the scope of equivalents,[26] namely the disclosure-dedication doctrine.  276 F.3d at 1313.

Disclosure-dedication is related to ensnarement and prosecution history estoppel and leads to the same outcome, namely noninfringement—"when a patent drafter discloses but declines to claim subject matter . . . this action dedicates that unclaimed subject matter to the public.  Application of the doctrine of equivalents to recapture subject matter deliberately left unclaimed would 'conflict with the primacy of the claims in defining the scope of the patentee's exclusive right.'"  *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002) (en banc).

Cox explains further that it cites to *Smith & Nephew* to show that "Sprint cannot skirt the written description requirement by choosing to assert infringement under the doctrine of equivalents."  (D.I. 633 at 3)  Cox does not explain why the disclosure-dedication doctrine is the appropriate avenue for the analysis.  At the same time, Cox addresses *Wright Medical* and explains that the ensnarement analysis from *Wilson Sporting Goods* (the seminal case on the subject) is not at issue in the case at bar:

> Sprint's other case, *Wright Medical*, also fails to address the correct question. . . . In *Wright Medical*, the Court addressed a "hypothetical claim," similar to the "hypothetical claim" performed in the *Wilson Sporting Goods* case to determine whether a doctrine of equivalents claim would ensnare prior art.  No such hypothetical claim is suggested here[.]

(*Id.* at 3–4 (footnote omitted))  While Cox is correct that neither of the parties have suggested a "hypothetical claim" here, that failure is (in part) Cox's doing.  First, Cox argued that *Warner-Jenkinson* is inapposite, because it does not relate to ensnarement.  Second, Cox cited

---

[26] Also mentioned in the briefing are cases that discuss prosecution history estoppel as a limitation to the scope of equivalents.  *See, e.g.*, *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002).  While Cox mentions *Festo* in its surreply brief, (D.I. 633 at 1, 4, 5, 10), Sprint had no opportunity to respond to this new case citation, nor is it clear that Cox (or its experts) argue prosecution history estoppel as it relates to the Broadband Patents, (*see* D.I. 587, ex. 5 at ¶ 496 & n.270 (identifying, but not explaining, a prosecution history argument with respect to the '084 patent)).

ensnarement cases and argued facts aligned with ensnarement principles.  Finally, Cox argued that ensnarement should lead to invalidity for lack of written description.  (D.I. 608 at 10, 12 n.4; D.I. 633 at 4, 6, 10)  However, Cox did not, as is its burden in an ensnarement defense,[27] produce evidence of prior art that would challenge a hypothetical claim asserted under the doctrine of equivalents.

Sprint argues that Cox did not cite to "a single case extending the ensnarement doctrine to the written description requirement."  (D.I. 620 at 3)  The court agrees.  Absent such case law, even if Cox were to present sufficient evidence (which it has not) upon which a reasonable jury could find that Sprint's patent claims "ensnare[] behavior that, as a matter of law, the literal claims could not," (D.I. 633 at 6), the remedy would be noninfringement, not invalidity.

### d. Conclusion: Broadband Patents

Despite Cox's repeated attempts to broaden the court's claim construction, the court declines to re-cast its earlier constructions to encompass broad limitations to ATM technology to "the invention" or "the patents" or to add additional limitations, such as "connection-oriented," (D.I. 608 at 1), to the claims.  Moreover, as discussed above, the court declines to re-construe the claims to factor in Sprint's theories of infringement.

Based upon the briefing, Cox has not identified any case law that supports its contention that, after the written description requirement has been incorporated into the court's claim construction to narrow limitations of asserted claims, those same arguments and the written description requirement extend further to infringement under the doctrine of equivalents.  (D.I. 608 at 1)  "This proposition not only has no authoritative support, but also runs counter to what the Supreme Court has said about the doctrine of equivalents."  *Wright Medical*, 1999 WL 130578, at *2 (citing *Warner–Jenkinson,* 520 U.S. at 17).

---

[27] "The burden of producing evidence of prior art to challenge a hypothetical claim rests with an accused infringer, but the burden of proving patentability of the hypothetical claim rests with the patentee."  *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1380 (Fed. Cir. 2001) (citing *Streamfeeder, LLC v. Sure-Feed Sys., Inc.*, 175 F.3d 974, 984 (Fed. Cir. 1999)); *see also G. David Jang, M.D. v. Boston Sci. Corp.*, No. 2016-1275, 2017 WL 4321270, at *6 (Fed. Cir. Sept. 29, 2017).

In addition to the lack of citation to case law supporting its position, Cox's experts did not provide opinions as to the doctrine of equivalents, and their written description analysis explaining that ATM and IP are antithetical technologies is predicated on the time of invention and not (as required by the doctrine of equivalents) the time of infringement. The facts as alleged by Cox (even though Cox does not necessarily name its claims accordingly) appear to reference known patent law principles of vitiation and ensnarement, though these principles lead to noninfringement of the asserted patents, (*see, e.g.*, D.I. 592 at 10), and not the requested remedy of "summary judgment of invalidity[,]" (D.I. 608 at 1).

For these reasons, as it relates to claims asserted under the doctrine of equivalents (and specifically the asserted claims of the Broadband Patents), the court concludes that Cox has not produced any evidence upon which a reasonable jury could invalidate these claims for lack of written description. Therefore, summary judgment of no invalidity as to written description is appropriate.

### 2. Call Control Patents

Neither party has stated affirmatively whether or not Sprint avers that Cox literally infringes the Call Control Patents. However, based upon the arguments, Sprint appears to assert literal infringement of at least some of the claims of the Call Control Patents. (D.I. 587 at 13–14; D.I 608) With respect to these patents, Sprint contends that "the [c]ourt expressly rejected Cox's attempt to inject requirements into the claims, holding that the specification discloses a broader invention. Yet, Cox (through Dr. Min and Dr. Almeroth) continues to advance opinions that the [c]ourt considered and expressly rejected as unsupported by the specification." (D.I. 587 at 13) In its brief, Sprint chronicles the ways in which, it asserts, Drs. Min and Almeroth contradict the court's claim construction. (*Id.*)

Cox agrees with Sprint that, in regard to the Call Control Patents, claim construction issues are central to the written description dispute. (D.I. 608 at 11) Cox argues that after the court's May 2017 Memorandum Order on claim construction, (D.I. 541), "the Court's constructions [do not] reach [the question of] whether the packet network must be connection-

oriented or connectionless. That distinction, which fully accounts for the Court's constructions, is the basis for the § 112 opinions expressed by Cox's experts on the Call Control patents."[28] (D.I. 608 at 11 (citations omitted)) Cox references its statement of facts, paragraphs 2 and 4 (as well as paragraphs 1 and 3), as explaining its experts' opinions. (*Id.*)

### a. Claim construction

For the reasons discussed below, the court declines to perform additional, supplemental construction. Cox acknowledges that its experts performed additional claim construction, and argues that this is necessary, because "the [c]ourt's constructions never reach [the question of] whether the packet network must be connection-oriented or connectionless." (D.I. 608 at 11) Sprint does not propose an alternative construction, and instead, Sprint avers that "the [c]ourt soundly rejected each of Cox's arguments during claim construction[.]" (D.I. 620 at 2)

Meanwhile, Cox's experts were not consistent in their proposed limitations to the claim construction. (*Compare* D.I. 587, ex. 2 at ¶¶ 8–9 (relying on a "connection-oriented" limitation) *with id.*, ex, 5 at ¶¶ 509–15 (relying on a limitation to ATM technology)) Nor were Cox's experts specific about which claim limitations should be construed or why—Dr. Min explained his reasoning based upon some of the patents as a group, (D.I. 587; ex. 2 at 8–9 (referring to the "Call Control Patents")), and Dr. Almeroth combined the Broadband and Call Control Patents in single argument, (*id.*, ex. 5 at 509–15 (citing the '932 (Call Control) and '429 (Broadband) patent specifications)).[29] This lack of specificity is sufficient to terminate the question of claim construction, which Cox argues, (D.I. 608 at 11), is dispositive of its arguments on written description.

---

[28] Dr. Min based his 2017 opinions on his 2016 expert report. (D.I. 587, ex. 2 at ¶ 8 n.14 (citing D.I. 587, ex. 1 at ¶¶ 40–123)) But this portion of the report makes no reference to the specification of the Call Control Patents and does not identify any other intrinsic evidence that supports his opinion. (D.I. 587, ex. 1 at ¶¶ 40–123) Although Cox raised the issue of written description as to the Broadband Patents during summary judgment and claim construction, (D.I. 357), Cox did not raise written description (now presented under the guise of Dr. Min) in any of its other claim construction briefs, especially in relation to the most recent claim construction as to the Call Control Patents, (*see* D.I. 373; D.I. 505, D.I. 506).

[29] In contrast, the court addressed ATM limitations in claim 1 of the '084 patent after the parties had argued with specificity as to terms and claim limitations. (D.I. 399, D.I. 400)

Additionally, for the reasons discussed below, even if Cox's experts were to identify with specificity the claim limitations in need of construction, as is discussed below, the evidence presented is insufficient to lead the court, as a matter of law, to agree that either of the "ATM" or "connection-oriented" restrictions (to unknown claim terms and limitations) are either necessary or appropriate.  Finally, were the court to agree with the limiting constructions stated by Cox's experts, Cox has not presented evidence upon which a reasonable jury could invalidate the Call Control Patents for lack of written description.  *Eli Lilly & Co.*, 251 F.3d at 962.

### b. Cox's expert opinions

Paragraph 2 of Cox's statement of facts states that Dr. Min's 2017 report, at paragraph 7 explains "the vast differences between connectionless (such as IP) and connection-oriented (such as ATM) protocols[.]"  (D.I. 608 at ¶ 2) (brackets omitted)  However, paragraph 7 of Dr. Min's 2017 report relates to the Broadband Patents, and not the Call Control Patents.  (D.I. 587, ex. 2 at ¶ 7)  Paragraph 9 relates to the Call Control patents, and Cox notes that in it, "Dr. Min opined that a person of ordinary skill in the art would similarly not [have] understood the inventors of the Call Control Patents to be in possession of a connectionless invention based on 'disclosure regarding only connection[-]oriented ATM.'"  (D.I. 608 at ¶ 2)

In paragraph 4 of its statement of facts, Cox identifies paragraphs 490–515 of Dr. Almeroth's expert report on invalidity as supporting three arguments—of these, only one relates to Dr. Min's ATM-versus-IP argument as to written description.[30]  (D.I. 608 at ¶ 4)  According to Cox, "Dr. Almeroth opined that a person of ordinary skill would not understand the inventors of the Call Control Patents . . . to be in possession **of an ATM invention**,[31] because a person of

---

[30] Because Cox continues to assert the written description requirement as to the Broadband Patents, Dr. Almeroth's report is confusing.  In it, he presented two arguments as to "the patents" in general, grouping together and opining as to invalidity of the Broadband and Call Control Patents in Sections XV.B and C.  (D.I. 587, ex. 5 at ¶¶ 500–15)  In Section XV.A, he presented an argument related to the Call Control Patents that is not discussed in detail in the briefs on summary judgment.  (*Id.* at ¶¶ 490–99)  The ATM versus IP distinctions are addressed in relation to all the patents-in-suit in Section XV.C—the court addresses this argument as to the Call Control Patents in this section.  The court addresses Dr. Almeroth's opinions (and specifically Section XV.A of his report) in relation to Sprint's motion to exclude.

[31] This statement is the opposite of Dr. Min's opinion on written description.  (D.I. 587, ex. 2 at ¶ 9)  However, in Section XV.C of his report, Dr. Almeroth never actually opined (in any way) about what a person of

22

ordinary skill would have understood that ATM and IP 'are inherently different protocols,' where 'ATM is connection oriented,' and 'IP on the other hand, is a connectionless protocol.'" (*Id.* (emphasis added) (citing D.I. 587, ex. 5 at ¶ 511))

### (i) Dr. Min

Dr. Min stated that he based his opinion on the court's claim construction, "[a]s construed, the Call Control Patents are not limited to ATM systems or for that matter, connection-oriented systems." (D.I. 587, ex. 2 at ¶ 9) Dr. Min even acknowledged that "the full scope of [the] claimed invention" in the Call Control Patents is broad enough to encompass both ATM and IP as well as connection-oriented and connectionless protocols. (*Id.*) None of these facts are in dispute. And yet, Dr. Min added limitations to the claims as a whole by reading in limitations from the specification, which he referred to as a "disclosure regarding only connection[-]oriented ATM[.]" (*Id.*) Effectively, Dr. Min opined that (unlike the Broadband Patents in which specific claim limitations were restricted to ATM technology) all claims of the Call Control Patents should be confined to "connection[-]oriented ATM" technologies.[32] In support of his opinion Dr. Min identified extrinsic and intrinsic evidence.

The extrinsic evidence from Dr. Min is primarily his opinions from paragraphs 40–123 of his 2016 report and his explanation that "the invention" disclosed in the shared specification of the Call Control Patents "is directed to the solution of problems that only arise in connection[-]oriented networks (namely, the fact that the switches that handle bearer traffic also handle the selection of a communications path)[.]"[33] (D.I. 587, ex. 2 at ¶ 8) He filled in the details with

---

ordinary skill would conclude that the inventor was or was not in possession of. (*Id.*, ex. 5 at ¶¶ 509–15) Therefore, this is attorney argument, and the court is left confused as to why Cox's attorneys would characterize Dr. Almeroth's (unstated) opinion in such a way as to contradict Dr. Min's stated opinion.

[32] This is especially problematic, because the Broadband Patents incorporate by reference the common-specification of the Call Control Patents, which should have been a factor in construing various claim limitations in the Broadband Patents. Dr. Min did not consider the question of incorporation by reference in his opinions. (D.I. 587, ex. 4 at 25:19–26:4) Cox does not dispute this fact. (D.I. 587 at ¶¶ 32–33; D.I. 608 at 3–4)

[33] Dr. Min based this statement largely on statements in the specification about prior art approaches and some embodiments. (D.I. 587, ex. 2 at ¶ 8 n.11) While Dr. Min identifies some of the benefits identified in the specification, he cites to (but fails to mention) others, for example, he does not mention that "an advantage of the present invention is its ability to treat narrowband switches . . . interchangeably. . . . This allows the network to pull

(ostensibly) the knowledge of a person of ordinary skill in the art and observed that "[t]hese problems do not arise in, and these benefits are not achieved in 'connectionless' networks where no path for a call is ever selected, but rather the path for each packet comprising the call is separately selected." (*Id.*)

As for intrinsic evidence, Dr. Min opined that the disclosure of "the transmission of bearer traffic in one non-TDM [(time division multiplexed)] format: ATM[34] . . . [and the] fact [that] the term 'IP' or 'internet protocol' does not appear anywhere in the specification[]" supports his conclusion that a person of ordinary skill in the art would not "consider disclosure of ATM for carrying bearer traffic to teach or express possession of an invention that uses connectionless protocols, such as IP, to transmit bearer traffic (i.e., voice)." (*Id.* (footnotes omitted)) The first cited portion of the specification employs open-ended language and refers to "[b]roadband systems, **such as** Asynchronous Transfer Mode (ATM)[.]" ('932 patent, 2:28–29 (emphasis added)) The phrase "such as" is commonly used in patents to identify non-limiting examples. Additionally, the specification discusses the concept of "a connection" using similarly exemplary language:

> A connection is the media between two network elements that allows the transfer of information. A few **examples** of connections are: digital T1 lines, OC-3 optical fibers, packet connections, dedicated access lines, microwave transmission, and cellular radio. As those skilled in the art are aware, connections can be described in a range from general to specific. All of the media between two switches is a general description and **might** correspond to a virtual path in an ATM system or a trunk groups in a Tl system. An individual circuit between two elements is more specific and **might** correspond to a virtual channel in an ATM system or a DS0 circuit in a Tl system. Connections can also be described as being logical or physical. Physical connections are electrical-mechanical media. Logical connections are paths which follow physical

---

narrowband switches out of service without taking extreme measures. In turn, this simplifies the introduction of new services into the network." ('3,561 patent, 21:48–54)

[34] Dr. Min cited to the '932 patent at column 2, lines 28-36 and column 4, line 64 through column 5, line 15 as supporting this limitation. (D.I. 587, ex. 2 at ¶ 8 n.12) Dr. Min also explained that the Call Control Patents share a common specification. (*Id.*)

> connections, but are differentiated from one another based on format and protocol. The term "connection" includes this entire range and the meaning varies according to the context in which the term is used. The present invention could make selections encompassing the entire range of connections.

('932 patent, 4:64-5:15 (exemplary language emphasized)) The cited portions of the specification are not limiting and do not, on their own, lead to the conclusion that the applicant intended to disavow all technologies other than ATM. Moreover, the specification does not employ the terms used by Dr. Min (e.g. "TDM," "connectionless," or "connection-oriented") and the cited passages directly contradict Dr. Min's statement about the disclosure of ATM as the sole "non-TDM" technology, because "packet radio," "cellular radio," and "microwave transmission" could be interpreted to be, inter alia, "non-TDM." Neither Dr. Min nor Cox provides any explanation as to why these examples should be limiting. "Where a specification does not require a limitation, that limitation should not be read from the specification into the claims." *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988) (citing *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed.Cir.1988)).

### (ii) Dr. Wicker's rebuttal testimony

Sprint's expert, Dr. Wicker, provided extensive evidence disputing Dr. Min's 2016 report about the differences between ATM and IP networks. For example, Dr. Wicker presented unrebutted evidence that TCP (a connection-oriented protocol) is used extensively with IP in what is commonly known as "TCP/IP." (D.I. 620, ex. 2 at ¶¶ 154–55) Dr. Wicker acknowledged that UDP is a connectionless alternative to TCP that is also used at Layer 4 in conjunction with IP in what is known as "UDP/IP." (*Id.*) However, Dr. Wicker explained that voice communications were often transported over the connectionless UDP/IP protocol using a higher-level protocol, named "RTP," which provided "end-to-end delivery services[,]" and which Dr. Wicker opined is "akin to the virtual circuit and virtual path identifiers included within an ATM cell." (*Id.* at ¶¶ 160–64) Dr. Wicker also identified other technologies within IP to manage phone calls, including RSVP and DiffServ, for setting up "connection oriented path[s] within an IP network." (*Id.* at ¶¶ 165–78) Additionally, Dr. Wicker produced evidence, (*id.* at

¶¶ 193–205), to support his opinion that "at the time of [the] invention[of the patents-in-suit], those skilled in the art would have known that IP networks were interoperable with ATM networks and either or both could be used[,]" (*id.* at ¶ 192). Were the court inclined to engage in claim construction (which it is not), this unrebutted testimony would most likely be persuasive extrinsic evidence that would be useful in discounting Dr. Min's assertions of the all-out war between ATM and IP at the time of invention. Also, as it relates to summary judgment, Dr. Wicker's testimony in the record would most likely demonstrate that Dr. Min's testimony would not amount to the clear and convincing evidence that a reasonable jury would need to invalidate the Call Control Patents for lack of written description. *Eli Lilly & Co.*, 251 F.3d at 962.

### (iii) Dr. Almeroth

In paragraph 4 of its statement of facts, Cox identifies several arguments presented by Dr. Almeroth. (D.I. 608 at 6–7 at ¶ 4) One of these relates to written description. (*Id.* (citing D.I. 587, ex. 5 at ¶ 511)) Like Dr. Min, Dr. Almeroth relied on the same exemplary language from the "Background of the Invention" section of the Call Control Patents that identifies "[b]roadband systems **such as** Asynchronous Transfer Mode (ATM)[.]" (*Id.* at ¶ 509 (citing '932 patent 2:27–36)) He juxtaposed this (not limiting) language from the '932 patent with limiting language from the '429 patent (one of the Broadband Patents) and effectively suggested a "limitation-by-association." (*Id.*) Dr. Almeroth repeated this juxtaposition a second time with similarly exemplary language (this time using the word "might") from the '932 patent accompanied by a quotation from the '429 specification. (*Id.* at ¶ 510) As with Dr. Min's testimony, Dr. Almeroth's expert report provides no specific basis for a claim construction, and the identified intrinsic evidence of exemplary, non-limiting statements is similarly unpersuasive.

### c. Conclusion: Call Control Patents

As it relates to the Call Control Patents, Cox has based its argument on a claim construction restricting unknown limitations from unknown claims of the Call Control Patents to

either "connection-oriented networks"[35] or to "ATM technology."  This argument lacks specificity, and the court declines to construe these unidentified terms.  For the reasons discussed above, summary judgment of no invalidity is appropriate.

### 3. Conclusion

Both parties have moved for summary judgment as to written description.  With respect to the Broadband Patents, the court heard argument on the issue of written description and adopted Cox's claim construction limiting specific claim limitations to ATM networks.  As a result, the court granted summary judgment of no literal infringement.  Sprint now asserts claims of the Broadband Patents under the doctrine of equivalents.  Cox now attempts to re-argue invalidity for lack of written description, citing facts and case law that stand for various principles related to the doctrine of equivalents (ensnarement, prosecution history estoppel, and vitiation) for which the remedy is noninfringment and not invalidity.  With regards to the Call Control Patents, Cox bases its written description argument on a baseless claim construction that lacks specificity as to which terms and claim limitations are involved.  Additionally, the evidence presented is insufficient to support the claim construction Cox proposes.  Taken together, Cox has presented no evidence of lack of written description as to either the Call Control Patents or the Broadband Patents.  *Eli Lilly & Co.*, 251 F.3d at 962.  Therefore, the court grants Sprint's motion and denies Cox's motion.

### B. Motion to Exclude

Sprint argues in the alternative that "[e]ven if Cox put forth a viable written description defense ([which] it has not), the expert opinions provided by Dr. Min and Dr. Almeroth should be excluded because the testimony is inconsistent with the Court's claim construction[,] is unreliable and unhelpful to the finder of fact."  (D.I. 587 at 15–16 (internal quotation marks and citations omitted)).  Cox responds that "both Dr. Min and Dr. Almeroth testified, they applied the

---

[35] Cox argues, in Section II.A of its brief (the section related to exclusion of the expert testimony) that it "has always maintained that the asserted patents should be restricted to connection-oriented technologies for the Call Control Patents, and ATM for the Broadband Patents."  (D.I. 608 at 12)  This is attorney argument.  Unfortunately, neither of Cox's experts stated this argument with such clarity in their reports.

Court's construction to understand the scope of the claim, and then examined the disclosure to determine whether that claim scope was supported." (D.I. 608 at 11–12) Having reviewed the record, the court agrees with Sprint.

### 1. Dr. Min

#### a. Broadband Patents

Dr. Min's testimony as to the Broadband Patents identified the court's claim construction and the various ATM-related constructions for the "interworking multiplexer" and "asynchronous communication" terms. (D.I. 587, ex. 2 at ¶ 6) However, Dr. Min then opined that "to the extent the claims of the '064 patent and '429 patent are found to encompass systems that use IP or connectionless protocols to transmit bearer traffic **through the doctrine of equivalents**, this exceeds the written description of the [Broadband] Patents as would be understood by a person of ordinary skill in the art." (*Id.* at ¶ 7 (emphasis added) (footnotes omitted)) As discussed extensively above in Section IV.A.1, this statement is contrary to the law and is, therefore, unhelpful and likely to confuse a jury. *Daubert*, 509 U.S. at 597.

#### b. Call Control Patents

In relation to the Call Control Patents, Dr. Min acknowledged the court's claim construction and recited that "[a]s construed, the Call Control Patents are not limited to ATM systems or for that matter, connection-oriented systems." (D.I. 587, ex. 2 at ¶ 9) However, this statement is surrounded by language contradicting the construction. First, Dr. Min explained that "[t]he specification of the Call Control Patents states that the invention they disclose is directed to the solution of problems that only arise in connection oriented networks[.]" (*Id.* at ¶ 8) Second, he read in limitations from his prior reports and characterized the specification as a "disclosure of ATM for carrying bearer traffic to teach or express possession of an invention that uses connectionless protocols, such as IP to transmit bearer traffic (i.e., voice)."[36] (*Id.*) Third, he

---

[36] This is the claim construction that Cox acknowledges is at issue. (D.I. 608 at 11) Here Dr. Min effectively expressed the opinion that some aspect of at least one of the claims of the Call Control Patents should be limited to ATM or connection-oriented protocols. (D.I. 587, ex. 2 at ¶ 8)

concluded that "a person of ordinary skill in the art would not understand the inventor of a patent directed to the solution of problems related to connection-oriented networks and whose benefits all stemmed from the invention's ability to solve those problems to be in possession of an invention that was applicable to connectionless networks." (*Id.*) Then, after reciting the court's construction, he concluded that the written description requirement was not met, because the claims were limited to "connection[-]oriented protocols such as ATM." (*Id.* at ¶ 9) Elsewhere, he drew other conclusions based upon reading in this "connection-oriented" limitation. (*Id.* at ¶¶ 10–12)

Moreover, Dr. Min read in other limitations contrary to the court's construction, each time acknowledging the court's construction and then expressing an opinion contrary to that construction based upon some limitation related to ATM and connection-oriented networking. (*Id.* at ¶¶ 11, 12, 13). Dr. Min expressed opinions on written description[37] that are contrary to the court's claim construction. This is unhelpful to the court, and it is likely to confuse the jury.

### 2. Dr. Almeroth

In the case of Dr. Almeroth, neither party addressed all three of the written description arguments presented by Dr. Almeroth in his expert report. As mentioned above, the court addresses this evidence in relation to Sprint's motion to exclude.

#### a. All asserted patents

Sections XV.B and C of Dr. Almeroth's report addressed "the asserted patents" as a whole. (D.I. 587, ex. 5 at ¶¶500-15)

#### (i) "Is not an ATM network"

According to Cox, "Dr. Almeroth opined that a person of ordinary skill would not understand the inventors of the Call Control Patents and Broadband Patents to be in possession

---

[37] Cox did not present these arguments as to written description during claim construction. (D.I. 490 at 4–14) Even though Dr. Min had opined generally on these issues in June 2016, (D.I. 587, ex. 1), he did not update his expert report to include the Call Control Patents until after the court's claim construction in May 2017, (*id.*, ex. 2). The court notes that Dr. Min based his 2017 opinions on claim constructions that the court had rejected barely a month prior. (*Compare* D.I. 490 at 4–14 *with* D.I. 587, ex. 2 at ¶¶ 8–13)

of an ATM invention, because a person of ordinary skill would have understood that ATM and IP 'are inherently different protocols,' where 'ATM is connection oriented,' and 'IP on the other hand, is a connectionless protocol.'" (D.I. 608 at ¶ 4 (citing D.I. 587, ex. 5 at ¶ 511)) As discussed above in Section IV.A.2.b(iii), Dr. Almeroth did not express an opinion in this regard, but his report included Section XV.C, which is entitled "The Asserted Patents Do Not Satisfy the Written Description Requirement to the Extent the Asynchronous Communication System / Packet Network Is Not an ATM Network[.]" (D.I. 587, ex. 5 at 312)

In this section, Dr. Almeroth combined quotes from the specification of the '932 patent (Call Control) and the '429 patent (Broadband). (*Id.* at ¶ 509–10) The rest of this section includes various extrinsic evidence, (*id.* at ¶¶ 511–14), as well as a rebuttal opinion to Dr. Wicker, (*id.* at ¶ 515). As discussed earlier, the juxtaposition of the '932 patent (which is not limited to ATM technologies) with text from the '429 patent (which is ostensibly limited to ATM technologies and which incorporates by reference the specification common to the Call Control Patents) is misleading and will most likely confuse a jury. Dr. Almeroth's opinion in this section is also based upon a claim construction that is contrary to the court's, and therefore should be excluded. *Cf Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1224 n.2 (Fed. Cir. 2006).

### (ii) "Establishing a communication path"

Section XV.B of Dr. Almeroth's report is entitled, "The Asserted Patents Do Not Satisfy the Written Description Requirement to the Extent the Processing System of the Claims Is Incapable of Establishing a Communication Path[.]" (D.I. 587, ex. 5 at 305) As with Section XV.C, the court is left guessing as to what Dr. Almeroth's stated opinion was, because he did not express or explain it. (*Id.* at ¶¶ 500-08) Instead, in this section, Dr. Almeroth opined that, in "the Call Control and [Broadband] patents[,] . . . the CCP . . . establish[es] a communication path through the network." (*Id.* at ¶ 501) After citing various embodiments from the '932 patent (a Call Control Patent), Dr. Almeroth summarized these embodiments as saying '[n]o matter how the call path is established, it results from the decision made by the 'processing system' (the

CCP).”[38]  (*Id.* at ¶ 503)  Elsewhere, Dr. Almeroth explained why “the entire call path” must be selected by the CCP.  (*Id.* at ¶ 504 (“the Asserted Patents only provide the proposed solution, if the ultimate decision that determines the entire call path, is made by the CCP/CCM.”); ¶ 507 (“the processing system of the [Broadband] Patents establishes a path through the network.”); ¶ 508 (“Mr. Christie’s [] conception documents . . . showed a call control model at center that establishes the path from the originating point to the destination point.”))

Sprint argues that “Dr. Almeroth contends that the specification for the Call Control Patents only discloses the processing system setting up an entire path for the communications. . . [, which is an interpretation of the specification that] this [c]ourt has twice rejected[.]”  (D.I. 587 at 19)  Cox responds that “[w]hat Dr. Almeroth’s opinion explains, is that a person of skill would understand that the ‘processing system’ to be critical to that process, i.e., that makes at least one selection that will determine how the voice will flow[,]” and that paragraph 503 of the report, which also quotes the specification, is an acknowledgement from Dr. Almeroth “that components other than the processing system can be involved in the selecting the path the voice will take[.]”  (D.I. 608 at 14–15)

During claim construction, Cox argued extensively that the “processing system” (e.g., the CCP) must select the entire call path.  (D.I. 490 at 5–6 (limitations 2(a), 2(b)); D.I. 505 at 11–12)  The court rejected these constructions.  (D.I. 541 *passim*)  Cox identified the one statement (paragraph 503) in which Dr. Almeroth parsed his language to potentially squeeze within the boundaries of the court’s construction, but this does not overcome the fact that the rest of his opinion directly contradicts the court’s claim construction.  For this reason, his opinion shall be excluded.  *Cf Liquid Dynamics Corp.*, 449 F.3d at 1224 n.2 (Fed. Cir. 2006).

---

[38] This statement may fit within the boundaries of the court’s claim construction, but Dr. Almeroth’s report lacks sufficient detail to determine whether this is, in fact, the case.  (D.I. 587, ex. 5 at ¶ 503)  Presumably, and the court must speculate here, because Dr. Almeroth did not explain the logic of his argument, but Dr. Almeroth may have reasoned that if, as required by the specification, “the CCP will always select at least one network characteristic[,]” (‘932 patent, 7:28–29),  then “[n]o matter how the call path is established, [the call path] results from the decision made by the ‘processing system’ (the CCP)[,]” (D.I. 587, ex. 5 at ¶ 503).  However, he did not account for situations in which the CCP selects one network characteristic and the call path does not “result” from the decision made by the CCP.  (*Id.*)

### b. Call Control Patents

### (i) Signaling the multiplexer

In Section XV.A, paragraphs 490–499, of his 2017 report, Dr. Almeroth opined that Sprint engaged in nonstatutory-type double patenting, (D.I. 587, ex. 5 at ¶ 493), and that "[i]f the Call Control Patents are extended to allow messaging to the mux, Sprint effectively would have been granted a second family of patents, filed a year later in time, that claim the same invention as the Call Control Patents. That cannot be correct." (*Id.* at ¶ 499) As with many of Cox's arguments in this regard, the facts do not seem to line up with Cox's legal theory—for example, the facts as presented, if true, appear to point to some form of terminal disclaimer for the Broadband Patents. *See generally* § 804 MPEP (9th ed., Rev. 07.2015, Nov. 2015).

But Cox argues that Dr. Almeroth's opinion supports invalidity for lack of written description. (D.I. 608 at 14–15) Dr. Almeroth identified a number of reasons in his report. First, "[t]he Call Control Patents teach away from signaling from the CCP to control the MUX." (D.I. 587, ex. 5 at ¶ 492) This is based upon a narrow reading of the specification that dismisses a statement related to an alternative embodiment in which:

> As long as the connections correspond through the mux, the CCP can track the communication path properly. Alternatively, the connections may not correspond. In that case, signaling links between the muxes and the CCP would be required for the devices **to communicate** and allow the CCP **to track** the communication path.

('052 patent, 10:37–42 (emphasis added)) Dr. Almeroth interpreted this statement to mean that "the only messaging that may be passed between the MUX and CCP are to track connections the MUX makes[,]" (D.I. 587, ex. 5 at ¶ 492) He did not explain what the "to communicate" language means within the context of the embodiment discussed in Figure 3 of the Call Control Patents.[39] (*Id.*)

---

[39] Instead of addressing the "to communicate language," Cox avers that "Sprint's own expert acknowledged that the Call Control Patents teach 'tracking,' i.e., a passive action, rather than controlling the interworking multiplexer." (D.I. 633 at 8)

Sprint argues that the specification states that "signaling links between the muxes and the CCP would be required for the devices to communicate," and that "[c]onfronted with this disclosure, Dr. Almeroth admitted that the inventor did, in fact, literally disclose "a signaling link" between the MUX and CCP (even though a direct line was not included in the exemplary Figure 3)." (D.I. 587 at 18–19 (citing *id.* at ¶ 36; '932 patent, 10:42-45)) Cox alleges that "Sprint mischaracterizes Dr. Almeroth's opinion[.]"(D.I. 608 at 14)

Dr. Almeroth's deposition exposed additional issues not raised in his expert report—for example, Dr. Almeroth qualified his opinion that Mr. Christie (the inventor) "calls it a signaling link. But again, I think it's clear that what he's describing here is the functionality only of tracking the communication path." (D.I. 587, ex. 6 at 210:15–211:14) In his report, Dr. Almeroth did not explain why he relied on a definition of "signaling link" that is limited to "tracking the communication path," (*id.*, ex. 5 at ¶¶ 490–92), to the exclusion of specific examples of "signaling links" in the specification, ('932 patent, 10:50–57), as well as discussion in relation to Figure 5 about signal formats, signal links, and the types of information (i.e., messages) transmitted over the signals, (*id.*, 14:60–15:64).[40] Based upon Dr. Almeroth's explanation, it is far from clear that the Call Control Patents "teach away" from signaling the multiplexer.[41]

Second, Dr. Almeroth opined that further support for this alleged teaching away is claim differentiation and double patenting. (D.I. 587, ex. 5 at ¶ 493) He explained that if the "device" in claim 1 of the '052 patent (one of the Call Control Patents) "can be the interworking mux, there is no non-obvious difference in the claims, **and Sprint has engaged in double**

---

[40] The court notes that the Broadband Patents, which incorporate by reference the specification of the Call Control Patents, are not limited to "tracking" over signaling links and explain that "[t]he term 'link' will be used to refer to the transmission media used to carry signaling." ('429 patent, 3:32–33) An expert report should address this consideration when deviating from the ordinary and customary meaning of terms in a patent specification.

[41] Sprint also argues that Dr. Almeroth's opinion in this section should be excluded, because "Dr. Almeroth persists that an entire call path, including use of the MUX, results from decisions made by the processing system." (D.I. 620 at 8 (citing D.I. 587 at ¶ 37)) Sprint is referring to Dr. Almeroth's deposition, with reference to the written description opinion he rendered in Section XV.B of his 2017 report. In that deposition, the section cited by Sprint, (D.I. 587, ex. 6 at 244:9–14), does not lead the court to a conclusion.

**patenting**."[42]  (*Id.* (emphasis added))  Dr. Almeroth does not explain why "engaging in double patenting" would lead a court to read a specification as "teaching away" from an embodiment (i.e., the "signaling links . . . for the devices to communicate" embodiment at column 10, lines 40–41 of the '052 patent) disclosed in the specification.  (*Id.*)  Moreover, Dr. Almeroth does not explain why the remedy would be narrowing the earlier-filed claims.[43]  (*Id.*)

Third, Dr. Almeroth explained that the "entire point of the [Broadband Patents] is the addition [of] communications control by 'providing virtual connections through the ATM interworking multiplexer.'"  (*Id.* at ¶ 494)  He identified link **191** in Figure 1 of the specification of the '429 patent (a Broadband Patent), which the text at column 4, lines 17–18 explains "could be any links capable of transporting data messages[,]" and opined that "[s]uch signaling to the ATM Interworking Multiplexer was missing from the Call Control Patents."  (*Id.* at ¶ 495)  Dr. Almeroth did not explain the basis for this opinion.  (*Id.*)

Fourth, Dr. Almeroth explained that "during prosecution of the '084 patent[44] [which is one of the Broadband Patents[45]], the applicants distinguished the [Broadband Patents] on the basis that they did not teach signaling to a switch, but rather, to an interworking unit."[46]  (*Id.* at ¶ 496 (citing to footnote 270, which is blank in the report))  The file history of the '084 patent contains no record of any such statement.  (D.I. 388-1, ex. 2)  During prosecution of the '084 patent, the examiner twice rejected claims in view of U.S. Patent No. 5,483,527 to Doshi, but none of the office actions mention any of the patents-in-suit.  (*Id.*)  Moreover, the '084 patent is

---

[42] Dr. Almeroth did not discuss the terminal disclaimers filed in the '084 and '064 patents.  (D.I. 587, ex. 5; '064 patent, front page; '084 patent, front page)

[43] In fact, the USPTO has a simple solution for obvious-type double patenting in commonly-owned applications from the same inventor—a terminal disclaimer.  § 804 MPEP (9th ed., Rev. 07.2015, Nov. 2015).

[44] During prosecution, the USPTO issued a nonstatutory double patenting rejection in light of the '301 patent, of which the '084 patent is a continuation.  (D.I. 388-1, ex.2, Aug. 15, 2000 Office Action)  Applicant responded by filing a terminal disclaimer.  (*Id.*, Nov. 29, 2000 Response to Office Action)

[45] *See supra* Section I

[46] In theory, were the facts in this argument true, it could support some form of prosecution history estoppel as to claims of various Broadband Patents asserted under doctrine of equivalents.  But this is an expert report on the invalidity of the Call Control Patents for lack of written description, and Dr. Almeroth does not explain (nor does Cox clarify) the legal theory behind this statement.  (D.I. 587, ex. 5 at ¶ 496)

one of the Broadband Patents, so it makes no sense that applicant would seek to distinguish the patent from other patents that share the same specification.[47]

Fifth, Dr. Almeroth relied on a document created by Mr. Christie to conclude that "[i]t is clear . . . that [] Mr. Christie had not conceived of an invention in which the processing system signaled the mux in October 1993[.]" (D.I. 587, ex. 5 at ¶ 497)  Then, based upon a statement by Sprint that "the inventions in the [Broadband Patents] were conceived by [Mr.] Christie no later than June 1994," Dr. Almeroth concluded that Mr. Christie did not arrive at "the concept of signaling to the interworking unit to control call setup . . . until June 1994 – [which was] *after* the Call Control Patents were filed on May [5], 1994." (*Id.* at ¶ 498 (emphasis in original)).

Dr. Almeroth did not explain why he interpreted "no later than June 1994" to mean a point in time in the seven week period immediately following May 5, 1994.  (*Id.*)  Presumably, this priority question would factor into an enablement or written description analysis under section 112, but that degree of detail is missing from the report.  (*Id.*)  Moreover, in his report, Dr. Almeroth did not address the fact that the Broadband Patents incorporate by reference (and claim priority to) the Call Control Patents.  (*Id.*)  Nor did Dr. Almeroth address whether the disclosure of the Call Control Patents could (or could not) enable claim 1 of the '429 patent.[48] (*Id.*)  Finally, Dr. Almeroth returned to his double patenting argument and explained that "[i]f the Call Control Patents could provide control through [the] interworking mux, . . . this altogether eliminates the purpose of the supposed invention of the [Broadband] Patents." (*Id.* at ¶ 499)

Taken together, Dr. Almeroth's opinion in Section XV.A of his 2017 report is not helpful, is contrary to the law, and is likely to confuse a jury.  His report lacks the level of detail and research that usually accompany such reports.  Specifically, Dr. Almeroth's testimony is not "based upon sufficient facts[,]" as is identified by his lack of investigation into the record, the patents, and their file histories (his statement about the '084 file history is untrue).  Dr.

---

[47] Arguing as suggested could be a violation of the USPTO's rules of conduct. *See, e.g.*, 37 C.F.R. § 1.56.

[48] This would seem to be a critical question—Dr. Almeroth's opinion would be moot if this were the case, because (if his other opinions were to hold true) a terminal disclaimer would be the remedy and not invalidity.

Almeroth's testimony also makes assumptions about the dates of invention and does not present facts to support his conclusions. Dr. Almeroth's testimony is not "the product of reliable principles and methods" in that, without explanation, he construes claim terms. Additionally, his testimony improperly applies legal principles, such as those relating to claim construction, prosecution history estoppel, and double patenting. In all, the court has no confidence that Dr. Almeroth "has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(d). Dr. Almeroth's testimony is likely to confuse a jury, and therefore, it must be excluded.

### 3. Conclusion

The testimony of Drs. Min and Almeroth is contrary to the court's claim constructions. The testimony of Dr. Almeroth is also likely to mislead and confuse a jury. For these reasons, their testimony as to written description should be excluded.

### C. Motion to Strike

Sprint's reply brief included an Appendix A, entitled "Sprint's Response to Cox's Statement of Facts (CSUF)[,]" which is a nine-page response to the statement of facts that Cox presented in its answering brief. (D.I. 620, appx. A; D.I. 608 at ¶¶ 1–7) Also, in responding to Cox's separate motion for summary judgment of invalidity for lack of written description (a motion that Cox introduced in its answering brief, and for which Sprint had presented no facts), (D.I. 608 at 1), Sprint argued that Drs. Min and Almeroth "have no idea whether Cox's implementation of a VoIP network operates, on a limitation-by-limitation basis, substantially similar to each element of the asserted claims." (D.I. 620 at 9–10 (citing footnote 14)) In footnote 14, Sprint details that "[a]s explained in Sprint's opposition to Cox's motion for summary judgment of non-infringement (D.I. 611 at 11–22), which is incorporated herein by reference, Dr. Wicker has done this analysis[.]" (D.I. 620 at 10 n.14)

Cox moved to strike this material, arguing that it "contain[s] additional pages of substantive arguments in response to Cox's statements of fact, as well as supplemental, affirmative statements of fact, to circumvent the 10-page-limit on reply briefs imposed by Local

Rule 7.1.3(a)(4)."[49]  (D.I. 634 at 1)  "In addition, Cox moves to strike as improper under Local Rule 7.1.3(a)(4) the arguments incorporated by reference into Sprint's Written Description Reply.  The net effect of Sprint's failure to adhere to the local rules is an effective *doubling* of the permitted brief length."  (*Id.* (emphasis in original))

Delaware Local Rule 7.1.3(a)(4) relates to the length of reply briefs and states that "[n]o opening or answering brief shall exceed 20 pages, and no reply brief shall exceed 10 pages, in each instance exclusive of any table of contents or table of citations."  The undersigned's standing order states:

> Except in extremely complicated cases, Judge Bataillon prefers briefs that are less than 25 pages (exclusive of the section numbering contested and uncontested issues).  Examples of complicated cases include patent and some securities cases.  Certain cases are generally not complicated, such as employment discrimination, social security, basic contract and tort cases, nor do most motions to dismiss or for summary judgment require briefs in excess of 25 pages.

*See* Brief Preferences, http://www.ned.uscourts.gov/internetDocs/jpar/JFB-Briefs.pdf (last accessed, Oct. 27 2017).  Cox identifies a number of cases that supposedly relate to the remedy it seeks.  Of these, *TQ Delta, LLC v. 2Wire, Inc.*, No. CV 13-1835-RGA, 2016 WL 5402180, (D. Del. Sept. 26, 2016), addresses a situation where the court struck "five pages of unsworn attorney argument about the technical scope of certain [] patents."  *TQ Delta*, 2016 WL 5402180, at *1 n.2.  Cox does not explain how the facts in *TQ Delta* relate to those in the case at bar. (D.I. 649 at 4)

Cox argues that it "has been disadvantaged by Sprint's improper use of Appendices A to expound its legal arguments."  (D.I. 634 at ¶ 7)  Cox cites to a case relating to page limits in an appellate briefing in which the D.C. Circuit explained that "page limits are important to maintain judicial efficiency and ensure fairness to opposing parties."  *Corson & Gruman Co. v. N.L.R.B.,*

---

[49] In its motion, Cox also moved to strike D.I. 621, appendix A, which was attached to Sprint's reply brief in relation to its motion of no anticipation by the Weinstein and Weinstein-Forgie references.  (D.I. 621, appx. A; D.I. 582).  The court has already resolved this motion, (D.I. 657), therefore, the court denies the motion as moot.

899 F.2d 47, 50 n.4 (D.C. Cir. 1990). Having reviewed the Appendix A in question, the court discerns no prejudice or disadvantage. Cox moved for summary judgment of invalidity for lack of written description in its answering brief. (D.I. 608 at 1) In so doing, Cox first responded to Sprint's statement of facts, (*id.* at 1–5), and then presented its own statement of facts related to its cross-motion, (*id.* at ¶¶1–7). Sprint's materials in Appendix A further elucidate the dispute of the parties, (D.I. 620, appx. A at 13–18), and present additional statements of fact in response to Cox's cross-motion, (*id.* at ¶¶ 1–10). Notwithstanding the pages addressing the contested issues, as per the court's Standing Order, the briefing pages have not exceeded the limit imposed by the Delaware Local Rules. Therefore, Cox's motion to strike is denied.

As to Sprint's incorporation by reference of materials in D.I. 611 at 11–22, although Cox has not explained why this is additional briefing, the brief (D.I. 611) is currently before the court on a separate summary judgment motion. Moreover, the arguments and expert opinions relevant to Cox's motion for noninfringement, (D.I. 590), are also relevant to the motions on written description, because Cox relies on many of the same factual assertions and legal theories (e.g., vitiation) in arguing a lack of written description. In light of the arguments presented in the case at bar, citation to D.I. 611 at 11–22 is relevant. Incorporating these materials by reference would technically increase the length of the brief beyond that allowed by the Delaware Local Rules. And Sprint has not explained why citation to those materials is insufficient, and the "incorporate by reference" language is necessary. Therefore, it is appropriate to strike the "which is incorporated by reference" language from footnote 14 on page 10 of D.I. 620.

## V. CONCLUSION

For the foregoing reasons, the court grants Sprint's motion, (D.I. 582), denies Cox's motion, (D.I. 608), and grants-in-part and denies-in-part Cox's motion, (D.I. 634).

An appropriate order shall issue.